IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WELLS HANN, JAMES COCO, | ) | |
| EDWARD HANN, BILLY MYERS, | ) | CIVIL ACTION NO.: 00-1908-DWA |
| FLOYD KING and DOUG RADIGAN, | ) | |
| | ) | Chief Judge Ambrose |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CRAWFORD & COMPANY, a corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

**Page**

FINDINGS OF FACT ......................................................................................... 4

I.      **Introduction And Parties** ................................................................ 4

II.     **Job Duties And Worksites On Environmental Pollution Projects** ...................... 6

III.    **The Four Projects At Issue In This Case** ............................................ 8

    A.    *The Exxon Valdez Project* .......................................................... 8

        1.    Plaintiffs' Locations, Duties And Pay On The Exxon Valdez Project ............... 9

        (a)    Doug Radigan ................................................................... 9

        (b)    Ed Hann ....................................................................... 10

        (c)    Billy Myers ................................................................... 11

        (d)    James Coco .................................................................... 11

        (e)    Floyd King .................................................................... 12

        2.    Worksites On The Exxon Valdez Project ....................................... 12

        (a)    The Valdez Command Center ..................................................... 14

        (b)    The Calais Building In Anchorage ............................................... 15

        (c)    The Exxon Barge-2 ............................................................. 16

        (d)    Exxon's Kenai Office .......................................................... 16

    B.    *The Ashland Oil Project* ........................................................... 17

    C.    *The Uni-Mart Project* .............................................................. 18

    D.    *The Buckeye Project* ............................................................... 19

VI.     **Plaintiffs' Knowledge Of The FLSA And Lack Of Diligence In Pursuing Their Rights** ...................................................................................... 21

    A.    *Doug Radigan* ...................................................................... 21

    B.    *Ed Hann* ........................................................................... 22

    C.    *James Coco* ........................................................................ 23

    D.    *Wells Hann* ........................................................................ 24

    E.    *Billy Myers* ....................................................................... 24

    F.    *Floyd King* ........................................................................ 25

CONCLUSIONS OF LAW ................................................................................. 26

I.      **Plaintiffs' Claims** .................................................................. 26

II.     **Statute of Limitations** ............................................................. 26

**III.**   **Equitable Tolling** ............................................................................... 27

    **A.**   ***Crawford's Compliance With FLSA Notice-Posting Requirements*** ................... 28

    **B.**   ***Other Equitable Considerations*** .......................................................... 31

    **C.**   ***Plaintiffs' Independent Knowledge Of The FLSA*** ................................... 33

        1.   Ed Hann ........................................................................................ 33

        2.   Doug Radigan ................................................................................ 36

        3.   James Coco ..................................................................................... 36

        4.   Wells Hann ..................................................................................... 37

        5.   Billy Myers .................................................................................... 38

        6.   Floyd King ..................................................................................... 39

**IV.**   **Plaintiffs Ed Hann, Billy Myers And Doug Radigan's Positions Are Exempt Under The FLSA** .................................................................................... 40

**V.**   **Conclusion** ....................................................................................... 45

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WELLS HANN, JAMES COCO, | ) | |
| EDWARD HANN, BILLY MYERS, | ) | CIVIL ACTION NO.: 00-1908-DWA |
| FLOYD KING and DOUG RADIGAN, | ) | |
| | ) | Chief Judge Ambrose |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CRAWFORD & COMPANY, a corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

The Court held a bench trial in the above-referenced matter May 16-20, 2005. The Court

now makes the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

**I.    Introduction And Parties**

1.     Based in Atlanta, Georgia, Defendant Crawford & Company is a provider of claims

adjusting and cost control services for insurance companies and self-insured businesses. (May

17, 2005 Tr. at 111-16.)

2.     As part of its business, Crawford provides catastrophe services for both natural

catastrophes, such as hurricanes, and man-made catastrophes, such as oil spills and other

environmental pollution disasters. (Id.)

3.     Plaintiffs are six former Crawford employees who assert overtime claims under the Fair

Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA") for work they performed on four

environmental pollution catastrophe projects between 1989 and January of 1992. (Third

Amended Complaint ("TAC") ¶ ¶ 4, 15, 19, 23, 31, 35.)

4.      The specific projects and timeframes for which each Plaintiff seeks recovery are as

follows:

- Wells Hann seeks overtime compensation for work he performed on the Ashland Oil Project ("Ashland Oil Project") between August 1989 and March 1991 in Pittsburgh, Pennsylvania (TAC ¶ 4; Pl. Ex. 85);

- James Coco seeks overtime compensation for work he performed on the Exxon Valdez Project ("Exxon Valdez Project") between April 1989 and August of 1989 (TAC ¶ 15; Pl. Ex. 83);[1]

- Edward Hann seeks overtime compensation for work he performed on the Exxon Valdez Project between August 1989 and September 1990 (TAC ¶ 19; Pl. Ex. 82);

- Billy Myers seeks overtime compensation for work he performed on the Exxon Valdez Project between April 1989 and March 1990, and the Buckeye Pipeline Petroleum Spill Project ("Buckeye Project") between April 1990 and January 1992 (TAC ¶ 23; Pl. Ex. 84);

- Floyd King seeks overtime compensation for work he performed on the Buckeye Project between April 1990 and December 1991 (TAC ¶ 31; Pl. Ex. 86); and

- Doug Radigan seeks overtime compensation for work he performed on the Exxon Valdez Project between May 1989 and September 1989, the Uni-Mart Convenience Store Underground Petroleum Leak ("Uni-Mart Project") between September 1989 and March 1990 and the Buckeye Project between April 1990 and January 1992 (TAC ¶ 35; Pl. Ex. 87; May 17, 2005 Tr. at 32-33.)

5.      Plaintiffs Wells Hann, James Coco, Edward Hann, Billy Myers and Floyd King filed suit

on September 21, 2000. (Dkt # 1.) Thereafter, on September 26, 2000, Plaintiffs filed an

amendment adding Plaintiff Doug Radigan. (Dkt # 2.)[2]

---

[1] Coco is deceased and Plaintiffs substituted his widow Elda Coco to pursue his claims.

[2] After seeking leave to amend, Plaintiffs filed a Second Amended Complaint on June 25, 2001. The Second Amended Complaint (which superseded those filed previously) only alleged claims on behalf of Wells Hann. (Dkt # 55.) Subsequently, the Court recognized "Wells Hann as the <u>sole plaintiff</u> in the Second Amended Complaint" and stated that the previous Complaints were of "no legal effect." (Dkt # 55 at 2, n.1 (emphasis added).) Later, Wells Hann sought leave to amend to "include the original allegations for the original seven members" of the case. (Dkt #

6.      Though Plaintiffs bring their claims well beyond the FLSA statute of limitations (two years before filing their action, or three years for willful violations), they assert that the statute of limitations should be equitably tolled based on Crawford's alleged failure to post the required Federal Wage and Hour Notice ("FLSA Notice") on the Projects at issue in this case.  (TAC ¶ 10.)

## II.    Job Duties And Worksites On Environmental Pollution Projects

7.      Crawford performs two basic functions on environmental pollution catastrophe projects: (1) claims functions; and (2) cost control functions.  (May 17, 2005 Tr. at 113-14, 117.)  Claims functions relate to handling of third-party claims arising out of the catastrophe, whereas cost control functions are designed to minimize the costs of environmental pollution projects for the client through monitoring the clean-up process and auditing invoices presented to the client by contractors involved in the clean-up process.  (Id. at 114-15, 117-18, 125-30.)

8.      Claims adjusters and claims supervisors perform traditional claims functions including investigating, evaluating and negotiating liability and damages for claims arising out of the catastrophe.  (Id. at 117-18.)  In carrying out these duties, adjusters make decisions about the proper value of claims and have authority to negotiate and resolve those claims.  (Id. at 118-20.)  When the dollar amount of a claim exceeds an adjuster's authority, the adjuster makes a settlement recommendation to the client, which the client usually accepts as the basis for resolving the claim.  (Id. at 119-21.)  Claims supervisors' duties include managing work flow and quality, reviewing adjuster billing records, granting authority to resolve claims, assisting

---

56 at ¶ 6.)  The Court granted Hann leave and, on June 17, 2002, Hann filed the Third Amended Complaint which included his claims and those of the other six Plaintiffs.  Plaintiff Herbert O'Neil voluntarily dismissed his claims on May 7, 2003.  (Dkt # 82.)  In its Motion for Summary Judgment, Crawford argued that, for purposes of the statute of limitations, June 17, 2002 is the filing date for the five Plaintiff's claims who were dismissed and later re-alleged in the Third Amended Complaint.  The Court has rejected that argument and has held that the filing dates are September 21, 2000 for each of the remaining Plaintiffs, except Radigan who joined the case on September 26, 2000.

with the resolution of complex or disputed claims and evaluating the performance of adjusters (including making recommendations regarding discipline). (Id. at 133-35.) Two kinds of claims that are common to environmental pollution projects are business interruption claims and lost wage claims. (Id. at 121-25.) Both of these types of claims require the adjuster to evaluate and document overtime compensation. (Id. at 30, 133-35; May 16, 2005 Tr. at 53-55, 164-65.) To handle these claims, an adjuster must have an understanding of employers' legal obligation to pay overtime compensation. (May 17, 2005 Tr. at 133-35; May 16, 2005 Tr. at 53-55.)

9.      Cost control functions are performed by monitors, invoice reviewers and the supervisors who oversee the monitors and invoice reviewers. (Id. at 117.) Monitors are responsible for ensuring that clean-up contractors do not charge Crawford's clients for unnecessary or un-incurred costs, and also have responsibility for documenting the progression of the clean-up effort. (Id. at 125-27.) In carrying out these functions, monitors identify discrepancies and negotiate the resolution of those discrepancies with clean-up contractors. (Id.) Monitors also report observations about changing conditions at the spill site, such as migration of oil to new locations and the adequacy of the contractor's response to those changing conditions. (Id. at 127-28.) Because part of a monitor's responsibilities includes documenting the hours worked by clean-up contractors, monitors must have an understanding of employers' legal obligation to pay certain employees overtime in order to properly perform their job. (Id. at 128-29.) Invoice reviewers perform an auditing function on environmental pollution projects. (Id. at 130-31.) The skill set necessary for an invoice reviewer is similar to that used by forensic accountants. (Id.) An invoice reviewer's primary responsibility is to analyze information from a variety of sources (including documentation from the monitors in the field) and to identify discrepancies between invoices submitted to the client and the underlying documentation. (Id.) After

identifying these discrepancies, invoice reviewers recommend a course of action to the client and play an active role in the negotiations between the client and the contractor.  (Id.)  Like adjusters and monitors, invoice reviewers job duties required an understanding of an employer's legal obligation to pay overtime compensation to certain employees.  (Id. at 57-59, 135-36.)

10.    When retained to provide catastrophe services, Crawford coordinates its response through its Atlanta, Georgia Home Office where Crawford managers contact catastrophe adjusters, monitors, invoice reviewers and supervisors from all over the country, who are then dispatched to the catastrophe site.  (Id. at 113, 115.)

11.    Once at a catastrophe site, Crawford personnel typically work from one of three kinds of locations: (1) at the client's facility; (2) at a Crawford temporary catastrophe office; or (3) at a permanent Crawford office.  (May 17, 2005 Tr. at 116.)

**III.    The Four Projects At Issue In This Case**

12.    The four projects at issue in this case are the Exxon Valdez Project, the Ashland Oil Project, the Uni-Mart Project and the Buckeye Project.

### A.    The Exxon Valdez Project

13.    The principal Project at issue in this case is the Exxon Valdez Project, which resulted from the March 1989 Exxon Valdez oil spill that occurred in Prince William Sound in Alaska.  (May 17, 2005 Tr. at 202.)  Shortly after the spill occurred, Exxon retained Crawford to provide claims adjusting and cost control services in connection with the spill.  (Id.)  Four Plaintiffs -- Doug Radigan, Ed Hann, Billy Myers and James Coco -- assert claims for overtime on the Exxon Valdez Project.  A fifth Plaintiff, Floyd King also worked on the Exxon Valdez Project, but does not assert claims for his work on that Project.  The specifics relating to each Plaintiff's work on the Exxon Valdez Project are set forth below.

1.    <u>Plaintiffs' Locations, Duties And Pay On The Exxon Valdez Project</u>

**(a)    Doug Radigan**

14.    Doug Radigan worked on the Exxon Valdez Project as a monitor from May 1989 to

September 1989 where he spent a significant portion of his time working in the field, as opposed

to working from an office.  (May 17, 2005 Tr. at 5-6.)  For the first two to three weeks of his

assignment on the Project, Radigan worked in and around various locations where clean-up

activities were taking place in Valdez, Alaska.  (<u>Id.</u> at 23.)  During that time frame, Radigan

reported to the Valdez Command Center.  (<u>Id.</u>)  After his first two to three weeks on the Project,

Radigan moved to the Exxon Barge II ("EB-2") where he lived and worked for the duration of

his assignment.  (<u>Id.</u> at 24.)  As a monitor, Radigan was responsible for verifying the activities of

clean up contractors and served as Exxon's "eyes and ears" at the clean-up sites.  (May 17, 2005

Tr. at 24-25, 125.)  Radigan verified clean-up contractors' use of equipment, supplies and

manpower to ensure that Exxon was not being overcharged.  (<u>Id.</u> at 24-24, 125-26; Def. Ex. B.)

Also, where clean-up contractors' attempted to report more labor hours for their employees than

Radigan observed, Radigan would address and resolve the discrepancy.  (<u>Id.</u> at 125-27.)

15.    Radigan was paid a commission, which was a percentage of the amount Exxon paid

Crawford for Plaintiffs' services.  (<u>Id.</u> at 26-27.)  To accomplish this, Crawford paid Radigan a

commission equal to 50% of the amount collected from Exxon less a 5% holdback and any

advances against commission that the Radigan had previously received.  (<u>Id.</u>)  Thereafter,

depending on whether Exxon paid the entire amount billed for Radigan's work, Radigan

recovered all or a portion of the holdback after Crawford received final payment from Exxon.

(<u>Id.</u>)  Aside from first and last weeks on the Project, Radigan never earned less than $800.00 in

any week and, in fact, Radigan received $800.00 even in weeks when he performed no work. (Id.)

### (b)    Ed Hann

16.    Ed Hann worked on the Exxon Valdez Project as a claims adjuster from approximately August 6, 1989 until September 1990. (May 16, 2005 Tr. at 152.) During his entire time on the Project, Hann worked in the Exxon Claims Office at the Calais Building in Anchorage, Alaska. (Id. at 173.) The Exxon Claims Office where Hann worked was located on the same floor as the offices of several Exxon executives (including Otto Harrison, Don Carpenter and Dick Green) and an outside accounting firm that was also working for Exxon in connection with the spill. (Id. at 173-74; May 17, 2005 Tr. at 239-40, 266-68.) Hann's primary responsibility on the Project was handling "tender boat" claims. Tender boats transport fish from fishing boats at sea to processing facilities on shore. As a result of the oil spill, tender boat operators lost income and, in turn, made claims against Exxon for the loss of that income. (May 16, 2005 at 176-77.) Hann was the only person handling tender boat claims on the Exxon Valdez Project, and Crawford retained Hann to help develop and oversee the tender boat claims program due to his expertise in business interruption claims, which are considered more complex and sophisticated than typical claims. (Id.) Hann's responsibilities involved investigating, evaluating and recommending settlement of claims ranging from $10,000.00 to $200,000.00 and, in virtually every instance, Exxon accepted his recommendation regarding settlement. (Id.) Hann was paid the same way as Plaintiff Radigan on the Exxon Valdez Project. (Id. at 178-79.)

### (c)     Billy Myers

17.     Billy Myers worked on the Exxon Valdez Project as an auditor/invoice reviewer and a claims adjuster from approximately April 1989 through March 1990.  (May 16, 2005 Trial Tr. at 108 & 114-115.)  From April of 1989 until August or September of 1989 Myers worked as an auditor/invoice reviewer on the first floor of the Exxon Valdez Command Center in Valdez, Alaska.  (Id. at 109-110, 132 & 136.)  In this role, Myers' primary responsibility was to analyze information, identify discrepancies, and participate in the resolution of those discrepancies.  (May 17, 2005 Tr. at 130-31.)  From August or September of 1989 until March of 1990, Myers worked as a claims adjuster in the Calais building in Anchorage, Alaska, where he worked on the same floor as Ed Hann and numerous Exxon employees including, Dick Green, Otto Harrison and Don Carpenter.  (May 16, 2005 Tr. at 132 & 136-137; May 17, 2005 Tr. at 266-268.)  As an adjuster, Myers performed traditional claims adjuster duties, including investigating, evaluating and negotiating liability and damages for claims arising out of the catastrophe.  (May 16, 2005 Tr. at 136; May 17, 2005 Tr. at 117-18.)  In carrying out these duties, Myers made decisions about the proper value of claims and had authority to negotiate and resolve those claims.  (May 17, 2005 Tr. at 118-20.)  Myers was paid the same way as Radigan and Hann on the Exxon Valdez Project.  (May 16, 2005 Tr. at 138-41.)

### (d)     James Coco

18.     James Coco, who was deceased at the time of trial, worked on the Exxon Valdez Project from April 1989 to August 1989.  (TAC ¶ 15; Pl. Ex. 83.)  Coco worked as an auditor/invoice reviewer at the Exxon Valdez Command Center in Valdez, Alaska for an unspecified period of

time.  (May 16, 2005 Tr. at 145-46.)  Coco later went to an unknown location to work as a

monitor.  (Id.)[3]

### (e)    Floyd King

19.    Plaintiff Floyd King worked on the Exxon Valdez Project as a supervisor over claims

adjusters for about six to eight months commencing in April of 1989.  (May 16, 2005 Trial Tr. at

26, 29-30.)  During his assignment, King worked from the Exxon Valdez Command Center in

Valdez, Alaska and from the Exxon Claims Office in Kenai, Alaska, which was one of several

claims offices Exxon opened in outlying towns during the Project.  (Id.; May 17, 2005 Tr. at

263-65.)  King's job duties consisted of supervising about 10 adjusters during the time he

worked on the Exxon Valdez Oil Spill Project.  (Id. at 43 & 46.)  Additionally, while assigned to

the Exxon Claims Office in Kenai, King was in charge of Crawford's operations in the Exxon

Claims Office.  (Id. at 46.)[4]

### 2.    Worksites On The Exxon Valdez Project

20.    In total, the following worksites on the Exxon Valdez Project are at issue: (1) the Exxon

Valdez Command Center; (2) Exxon's Calais Building Office in Anchorage; (3) the EB-2; and

(4) the Exxon Claims Office in Kenai, Alaska.  (May 16, 2005 Tr. at 25-26, 42-43, 132-33, 145,

173; May 17, 2005 Tr. at 23-24.)

21.    Exxon General Manager of Alaskan Operations Otto Harrison was responsible for

managing the entire Exxon Valdez Project.  (May 17, 2005 Tr. at 262-63, 273.)  Harrison, who

has no vested interest in the outcome of this litigation, stated, without equivocation, that the

---

[3]  Because Coco is deceased, he did not testify at trial and there was no evidence presented concerning the manner in which he was compensated on the Exxon Valdez Project.  As set forth in the Conclusions of Law, Coco's unavailability to testify at trial has prejudiced Defendant and is one of several reasons equitable tolling is not appropriate in this case.

[4]  Because King does not assert a claim for overtime on the Exxon Valdez Project, it is not necessary to consider King's method of pay on the Project.

locations where Plaintiffs worked were all multi-employer worksites operated and controlled by Exxon. (Id. at 262-63, 273.)[5] Crawford did not have any offices or other facilities of its own in Alaska that it used in connection with the Project. (May 17, 2005 Tr. at 207, 217-18, 228-29, 262-63; May 19, 2005 Tr. 127-28, 148-49.)[6] Rather, Crawford employees, as well as employees of other contractors and government agencies, worked from Exxon's multi-employer worksites along side Exxon personnel. (May 17, 2005 Tr. at 207-11, 218-19, 228-29, 235-39, 245, 254-55, 266-67, 273; May 16, 2005 Trial Tr. at 43.) Exxon controlled access to the locations where Plaintiffs worked by issuing identification badges to all Exxon employees and contractors. (May 17, 2005 Tr. at 237, 254-55.) All Crawford employees, including Plaintiffs, received Exxon identification badges upon arriving on the Project. (Id. at 23-24, 208-09, 237, 254-55, 272-75; May 16, 2005 Tr. at 175; Def. Ex. N.) The identification badges provided Plaintiffs with complete access to all areas of the Exxon worksites where they worked. (May 17, 2005 Tr. at 272-75.)

22.     Throughout the course of the Project, Exxon followed a strict policy of posting all required notices -- including the FLSA Notice -- in each of the locations where Exxon employees and contractors (including Crawford employees) worked. (May 17, 2005 Tr. at 234-35, 238-45, 256-59, 261-62, 266-67, 272-75; May 19, 2005 Tr. at 53-56, 82.) To ensure that the policy was followed, Exxon gathered and delivered all required notices -- including the FLSA Notice -- to

---

[5] Harrison's testimony operation and control of the worksites where Crawford employees worked was corroborated by Exxon Logistics and Operations Manager Don Carpenter, Crawford Project Manager William Tribble, Crawford Manager John Knight, and Plaintiffs Myers and Radigan, as well as Larry Smith and Tom Nort, who are Plaintiffs in the related-case of Archer v. Crawford, 98-CV-135, (W.D. Pa. 1998). (May 17, 2005 Tr. at 24, 207-11, 218-19, 228-29, 235-39, 245, 254-55, 266-67, 273; May 16, 2005 Trial Tr. at 43, 133; May 19, 2005 at 120-27, 148-49.)

[6] For purposes of the Exxon Valdez Project, Crawford coordinated its efforts from its Home Office in Atlanta, Georgia. (May 17, 2005 Tr. at 219-20.) Crawford conspicuously posted the FLSA Notice in several locations at the Home Office, including on the main employee bulletin board at the entrance to the company cafeteria. (May 19, 2005 Tr. at 196-99.)

each of its locations on the Project.  (Id. at 233-35, 241-42, 272.)  Moreover, Exxon Managers

Otto Harrison and Don Carpenter made a point of verifying the presence of required notices both

where they worked and at outlying locations they visited while carrying out their responsibilities

on the Project.  (Id. at 242-43, 271-72.)  During the course of the Project, both the federal and

state departments of labor conducted audits of Exxon's operations on the Project and neither

agency found any violations the FLSA Notice requirements.  (May 17, 2005 Tr. at 236, 260,

272.)

(a)    **The Valdez Command Center**

23.    Plaintiffs Billy Myers, Doug Radigan, James Coco and Floyd King worked from the

Exxon Valdez Command Center during a portion of their assignments on the Exxon Valdez

Project.  (May 16, 2005 Tr. at 42-43, 132-133,; 145; May 17, 2005 Tr. at 23-24.)  The Valdez

Command Center was located in a two story strip center in Valdez.  (May 17, 2005 Tr. at 228-

229, 236-37.)  Although Crawford employees working in the Command Center performed the

bulk of their work on the first floor of the Command Center -- where Exxon had posted a sign

stating "Exxon Claims" -- the work environment was "fluid," and Exxon employees, employees

from other contractors and employees with several government agencies worked together

throughout the Command Center.  (May 16, 2006 Tr. at 45, 100-01; May 17, 2005 Trial Tr. at

211-12, 218-19, 228-229, 245.)  Indeed, Crawford employees could access the second floor of

the Command Center by showing their I.D. badges and, in fact, went to the second floor to pick-

up or drop-off information, attend meetings, obtain photo identification badges and obtain meals

provided by Exxon.  (May 16, 2005 Tr. at 101-02; May 17 Tr. at 23-24; 208-11, 216, 237, 254-

55, 258-59, 273-75; May 19, 2005 Tr. at 128-29.)

24.     Exxon posted the FLSA Notice on both the first and second floors of the Valdez

Command Center.  (May 17, 2005 Tr. at 238, 258, 260; May 9, 2005 Tr. at 56.)  The FLSA

Notice was posted in the claims/invoice review area on the first floor on a bulletin board near a

coffee bar.  (May 17, 2005 Tr. at 258, 260; May 19, 2005 Tr. at 56.)  The FLSA Notice was also

posted in two readily accessible locations on the second floor of the Valdez Command Center,

including the area where Exxon employees and various contractors (including Crawford)

obtained their I.D. badges.  (May 17, 2005 Tr. at 237-38, 258-60.)[7]

25.     In sum, the FLSA Notices were conspicuously posted at the Exxon Valdez Command

Center in locations readily accessible to Plaintiffs who worked at that location.

### (b)     The Calais Building In Anchorage

26.     Plaintiffs Ed Hann and Billy Myers worked from the Exxon Claims Office in Anchorage,

which was housed in the Calais Building.  (May 16, 2005 Tr. at 132, 173-74.)  The Claims

Office was located on the same floor of the Calais Building where Exxon Executives Dick

Green, Otto Harrison, Don Carpenter and others had offices and where auditors from an outside

accounting firm were located.  (Id. at 173-74; May 17, 2005 Tr. at 239-40, 261-68.)

27.     In the Calais Building, Exxon posted the FLSA Notice in an employee break room near

the elevator bank on the floor where Plaintiffs worked.  (May 17,2005 Tr. at 239-41, 266-70.)[8]

---

[7]  The most any Plaintiff or any of Plaintiffs' witnesses testified to was that they did not see the FLSA Notice, and
Plaintiff Radigan specifically acknowledged that FLSA Notices may have been posted in the Command Center.
(May 16, 2005 Tr. at 46-47, 97, 116-17; May 17, 2005 Tr. at 27.))  Moreover, consistent with Otto Harrison's
placement of the FLSA Notice on a bulletin board near the coffee bar, Plaintiff Floyd King testified that there was a
bulletin board with notices posted on it near the coffee pot in the Valdez Command Center.  (May 16, 2005 Tr. at
70-71.)

[8]  Plaintiffs presented no conflicting testimony and merely established that they did not see the FLSA Notice during
the time they worked at the Calais Building.  (May 16,2005 Tr. at 116, 163.)

Furthermore, Crawford employees had access to all areas on the floor where Plaintiff's worked. (May 17, 2005 Tr. at 240-41, 268-69; May 19,2005 Tr. at 56, 131-32.)[9]

28.     In sum, the FLSA Notices were conspicuously posted at the Calais Building in Anchorage in a location readily accessible to Plaintiffs who worked at that location.

### (c)     The Exxon Barge-2

29.     Plaintiff Doug Radigan lived and worked on the Exxon Barge-2 ("EB-2") for all but approximately three weeks of his assignment on the Exxon Valdez Project.  (May 17, 2005 Tr. at 24.)  The EB-2 was one of several barges Exxon used for staging operations and housing contractors, including Crawford employees.  (Id. at 243-44, 270-71.)  FLSA Notices were conspicuously posted on housing barges and other marine vessels used by Exxon during the Project.  (Id. at 243-44, 270-71.)  In addition, Stanley Calloway, a former Crawford employee and former Plaintiff in the Moss v. Crawford case, testified without contradiction[10] that he observed the FLSA Notice in an office on the EB-2 where he and other Crawford employees worked.  (May 19, 2005 Tr. at 80, 82.)

30.     In sum, Exxon conspicuously posted the FLSA Notice on the EB-2 in areas readily accessible to Crawford employees working on that vessel.

### (d)     Exxon's Kenai Office

31.     Plaintiff Floyd King worked part of his assignment on the Exxon Valdez Project from the Exxon Claims Office in Kenai, Alaska, which was one of several claims offices Exxon

---

[9] As Plaintiff Ed Hann testified, the security guards were there to keep out the "general public," but once inside the claims area, Crawford employees could access the entire floor without restriction, including the break room where the FLSA Notice was conspicuously posted.  (May 16, 2005 Tr. at 113, 115-16, 162-63, 175; May 17, 2005 Tr. at 240-41, 268-69.)

[10]  Radigan did not see an FLSA Notice on the Project, but agreed it was "entirely possible" that FLSA Notices were posted in the locations where he worked.  (May 17, 2005 Tr. at 27.)

established in outlying towns during the Project.  (May 16, 2005 Tr. at 42; May 17, 2005 Tr. 263-65.)  The FLSA Notice was posted near the entrance of the Kenai Office.  (May 17, 2005 Tr. at 242-43, 261-62, 274; May 19, Tr. at 53-54.)

32.     In sum, the FLSA Notice was posted in Exxon's Kenai Claims Office where Crawford employees (including King) worked during the Exxon Valdez Project.[11]

###     B.     *The Ashland Oil Project*

33.     The Ashland Oil Project arose from a storage tank rupture on the Monongahela River on or about January 2, 1988 in Pittsburgh, Pennsylvania.  (May 17, 2005 Tr. at 136-137.)  Plaintiffs Wells Hann and Floyd King both worked on the Ashland Oil Project.  (May 16, 2005 Tr. at 51, 193-196; TAC ¶ ¶ 4, 31.)  However, only Hann has asserted a claim for overtime on the Project.  (Id.)

34.     Crawford based its operations on the Ashland Oil Project out of a temporary catastrophe office set up in the Jacobs Building on Greentree Hill (the "Jacobs Building") in mid-January 1988.  (May 17, 2005 Tr. at 142-144.)  Hann and King both worked from the Jacobs Building location during their respective assignments on the Ashland Oil Project.  (May 16, 2005 Tr. at 51, 62, 187, 195-96.)  In addition, while working on another project in Pittsburgh, Plaintiff Doug Radigan routinely went to Crawford's Ashland Oil Project Office in the Jacobs Building to see ¶ ¶ his brother Kip Radigan, who was working on the Ashland Project at the time.  (May 17, 2005 Tr. at 28-29.)[12]

---

[11]  King acknowledged that he does not know whether a FLSA Notice was posted in Exxon's Kenai office while he worked there.  (May 16, 2005 Tr. at 46-47.)

[12]  Wells Hann and Floyd King both testified that they do not know if an FLSA notice was posted in Crawford's office in the Jacobs Building.  (May 16, 2005 Tr. at 61, 189 & 194.)  Radigan did not testify about the presence of the FLSA Notice in the Jacobs Building office.

35.     On the Project, Wells Hann was a claims supervisor in charge of claims for thirteen governmental agencies.  (May 16, 2005 Tr. at 201-02.)  Hann was paid a commission equal to 45% of the amount Crawford billed for his services.  (Id.)  Depending on whether Ashland Oil approved the entire amount billed by Crawford, Hann recovered up to an additional 5%, which was held back from the initial commission payment.  (Id.)

36.     On or about January 15, 1988, Crawford Project Manager John Knight obtained all required employment notices (including the FLSA Notice) from Crawford's Pittsburgh Branch Office and posted those notices on an employee bulletin board in the Jacobs Building Office. (May 17, 2005 at 147-48, 154-56.)  The FLSA Notice remained posted in that location throughout the duration of the Ashland Oil Project.  (Id. at 154-56, 173-74.)  Knight's uncontradicted testimony on this point is corroborated by photographic evidence and testimony from a disinterested non-party witness Linda Straka, who worked as Crawford's office manager on the Ashland Oil Project.[13]  (Id.; Defendant's Exs. L1-2.)

37.     In sum, the FLSA Notice was conspicuously posted in the Jacobs Building office throughout the duration of the Ashland Oil Project.

## C.     The Uni-Mart Project

38.     The Uni-Mart Project was a short-lived Project that resulted from a 1989 underground storage tank leak in Pittsburgh, Pennsylvania.  (May 17, 2005 Tr. at 11-12; May 19, 2005 Tr. at 73-74.)  Plaintiff Doug Radigan worked on the Project for only three or four months after he left

---

[13]  At trial, Wells Hann conceded that he views Ms. Straka as a very credible witness and admitted having lunch with her shortly before trial.  (May 16, 2005 Tr. at 196-200.)  During the lunch meeting, Straka and Hann discussed the Ashland Oil Project and Straka told Hann that the FLSA Notice had been posted in the Jacobs Building.  (May 17, 2005 Tr. at 174-76.)  Straka also told Hann that she had received a message from Crawford's counsel and that she planned to return the call.  (Id.)  In response, Hann told Straka that he was going to dismiss his case and that she should not return a telephone call to Crawford's counsel.  (Id. at 175-176.)

the Exxon Valdez Project in September of 1989 and is the only Plaintiff who asserts a claim in connection with the Uni-Mart Project.  (May 17, 2005 Tr. at 27-30.)

39.     Radigan worked as a claims adjuster on the Uni-Mart Project and handled business interruption claims and lost wage claims.  (May 17, 2005 Tr. at 30.)  Both types of claims required Radigan to document and compute claims for overtime compensation.  (Id. at 30-31.) Radigan was compensated the same way as he was on the Exxon Valdez Project.  (Id. at 32.) However, Radigan does not know whether or not he received overtime compensation for hours in excess of 40 per week.  (Id. at 29, 32.)  Radigan presented no evidence or summary of damages he claims for the Uni-Mart Project.

40.     Crawford staged the Uni-Mart Project out of Crawford's Pittsburgh Branch Office, where the FLSA Notice had been conspicuously posted since 1982.  (May 19, 2005 Tr. at 68-71, 73-74.)  In sum, the FLSA Notice was posted on the Uni-Mart Project.[14]

### D.     The Buckeye Project

41.     The Buckeye Project stemmed from a ruptured oil pipeline that leaked into the Allegheny River near Pittsburgh, Pennsylvania in late March of early April, 1990.  (May 17, 2005 Tr. at 32, 220.)  Buckeye Pipeline retained Crawford to provide the same kind of claims and cost control services on the Buckeye Project as Crawford had provided for Exxon and Ashland Oil on those Environmental Pollution Catastrophes.  (Id. at 220-22.)  Crawford's involvement in the Buckeye Project concluded in January of 1992.  (Id. at 32-22.)

42.     Plaintiffs King, Myers and Radigan have asserted claims for work they performed on the Buckeye Project.  (TAC at ¶ ¶ 23, 31, 35.)  King worked on the Buckeye Project as the Project Manager from April of 1990 until December of 1991, Myers worked on the Buckeye Project

---

[14] Radigan admitted that it is "possible" that the FLSA Notice was posted on the Uni-Mart Project.  (May 17, 2005 Tr. at 32.)

performing traditional claims adjusting duties from April of 1990 until January of 1992, and Radigan worked on the Project from April 1990 to January 1992 as a monitor and invoice reviewer.  (May 16, 2005 Tr. at 52, 142; May 17, 2005 Tr. at 32-33.)  Radigan had complete responsibility for the monitoring functions and "very little" supervision during the time he worked as a monitor on the Project.  (Id.)  Each of these individuals was paid the same way on the Buckeye Project as he was paid on the Exxon Valdez Project.  (May 16, 2005 Tr. at 62 & 138; May 17, 2005 Tr. at 32.)

43.     During their assignments on the Project, Plaintiffs worked from a Crawford temporary office in Natrona Heights, Pennsylvania.  (Id. at 17-18.)  However, before going to the Natrona Heights Office, Plaintiffs checked in at the Jacobs Building Office where the FLSA Notice was conspicuously posted.  (Id. at 221-22.)[15]

44.     In sum, during the Buckeye Project, Plaintiffs had access to and, in fact, went to the Jacobs Building Office where the FLSA Notice was posted.

---

[15]  Plaintiffs did not present any definitive evidence concerning the presence or absence of an FLSA Notice in the Natrona Heights Office.  Myers provided no testimony about the presence or absence of the FLSA Notice in Natrona Heights and Radigan testified it was "possible" that the Notice was posted in that office.  (Id. at 32.)  With respect to whether the FLSA Notice was posted in any Crawford office he worked in, King testified that "[a]ll I can say is, I never saw it.  I don't know. . . . I didn't go around . . . investigating all the things on the walls."  (May 16, 2005 Tr. at 49-50.)  Although there was no definitive evidence establishing that the FLSA Notice was posted in the Natrona Heights Office, Crawford presented evidence that, on May 10, 1990, it sent updated FLSA Notices to "All Locations In The United States" along with a Memo stating:

> Under the Fair Labor Standards Act, Crawford & company is required to display the attached "Notice to Employees - Federal Minimum Wage" poster (Revised April 1990) where all employees can readily see it.  We ask that you immediately place the poster on your office bulletin board, and remove and discard the August, 1982 poster.

(May 19, 2005 Tr. at 71-71; Def. Ex. W.)

**IV.    Plaintiffs' Knowledge Of The FLSA And Lack Of Diligence In Pursuing Their Rights**

   ***A.    Doug Radigan***

45.    Since first receiving overtime in the 1980s, Doug Radigan acknowledged that has known

about the existence of a law requiring overtime compensation:

>   Q.    And when you worked for [Tilcon Dimino], you were paid time and half for all hours your worked in excess of 40 hours per week, is that correct?
>   A.    That's correct.
>   Q.    During the time -- since the time that you worked at Tilcon Dimino in the 1980's, you have known that there is a law requiring employers to pay overtime compensation for hours worked in excess of 40 per week, correct?
>   A.    That's correct.
>   Q.    Mr. Radigan, I am going to show you what has already been admitted as Defendant's Exhibit A. . . . It is a Fair Labor Standards Act minimum wage notice.  Do you see that?
>   A.    Yes.
>   Q.    And at the top of that notice, it informs you of the law, the Fair Labor Standards Act, correct?
>   A.    That's correct.
>   Q.    And down here underneath overtime pay, I want you to read what it says?
>   A.    Overtime pay, at least one and a half time your regular rate for pay for all hours worked over 40 hours in one work week.
>   Q.    You have known that much about the law since you worked at Tilcon Dimino in the 1980's, correct?
>   A.    That's correct.

(May 17, 2005 Tr. at 21-22.)

46.    Additionally, Radigan worked from several Crawford offices (other than those on

Projects at issue in this case) where Crawford conspicuously posted the FLSA Notice during the

time Radigan worked in each such office.  In June and July of 1993, Radigan attended training in

Atlanta, Georgia.  (Id. at 34.)  While attending training, Radigan went to the Home Office

cafeteria "every morning."  (Id.)  The FLSA Notice was conspicuously displayed at the entrance

to the cafeteria during the time Radigan was going to the cafeteria on a daily basis.  (May 19,

2005 Tr. at 195-98.)  In 1993, Radigan worked in Crawford's Wilmington, North Carolina

Branch Office for five or six months. (May 17, 2005 Tr. at 35.) Crawford posted the FLSA

Notice in the Wilmington Branch Office during the time Radigan worked there in an area to

which he had access. (May 19, 2005 Tr. at 151, 153-57.) Radigan also worked from Crawford

Offices in Fort Lauderdale, Florida (Hurricane Andrew 1992), San Francisco, California (1995 to

1996) and Pittsburgh, Pennsylvania (June to August 1997), and the FLSA Notices were

conspicuously posted at each of these locations. (May 17, 2005 Tr. at 34-36; 70-71; May 19,

2005 Tr. at 169-72.)

47.     In addition to the forgoing, Radigan's duties as an adjuster, monitor and invoice reviewer

while working for Crawford required him to understand overtime compensation. (May 17, 2005

Tr. at 25-26, 30-31, 135-36.) Written Monitor Instructions Radigan received on the Exxon

Valdez Project specifically state "overtime must be carefully scrutinized." (Id. at 25-26, Def. Ex.

B.) Finally, Radigan admitted that Crawford did nothing to cause his delay in asserting his

claims. (May 17, 2005 Tr. at 39.) Instead, Radigan attributes his delay to uncertainty about

whether adjusters are entitled to overtime compensation. (Id.)

### B.    Ed Hann

48.     Between 1972 and 1996, Ed Hann owned four businesses with as many as 16 employees

and gross annual revenues of between $300,000 and $1 million. (May 16, 2005 Tr. at 165-66.)

Each of these businesses engaged in interstate commerce and, as the owner of these businesses,

Hann made decisions on how to pay his employees and ensured that he complied with federal

and state wage and hour laws:

> Q.    Now, as the owner of these businesses, you understood it was your responsibility
>       to comply with state and federal laws, correct?
> A.    Yes.
> Q.    And that would include laws governing the way that you paid your employees,
>       correct?
> A.    Yes.

> Q.    And, in fact, you did comply with those laws, is that right?
> A.    Yes.

(Id. at 165-67.)

49.    On or about October 1, 1996, Hann went to work for Travelers Insurance Company ("Travelers") in Pittsburgh, Pennsylvania.  (Id. at 167.)  In connection with his employment at Travelers, Hann received at least two employee handbooks -- the first on October 25, 1996 and the second on April 8, 1998.  (Id. at 167-72; Def. Exs. P-S.)  Both handbooks specifically referenced the Fair Labor Standards Act and the requirement that non-exempt employees be paid time and a half for hours worked in excess of 40 in any week.  (May 16, 2005 Tr. at 169-72; Def. Ex Q at 32; Def. Ex. S at 22.)  This information virtually mirrors the information regarding overtime contained in the FLSA Notices in effect at the time Hann worked on the Exxon Valdez Project.  (Def. Ex A.)  In addition, since 1996, the year Hann started with Travelers, an FLSA Notice has been posted in at least four locations in the office where Hann worked, including on the cubicle wall immediately adjacent to his desk.  (May 19, 2005 Tr. at 60-64.)

50.    Finally, when Hann applied for work with Crawford in 1989, he had 37 years experience handling business interruption claims.  (May 16, 2005 Tr. at 165.)  Business interruption claims require an adjuster to document and evaluate claims for extra overtime expense incurred by the claimants.  (Id. at 165.)  In order to properly handle a business interruption claim, an adjuster must understand the legal obligation to pay overtime compensation to certain employees.  (May 17, 2005 Tr. at 122-23.)

## C.    James Coco

51.    Coco worked on the Hurricane Hugo Project in 1989 and 1990 where an FLSA Notice was conspicuously posted at the office associated with that Project.  (May 19, 2005 Tr. at 169-71, 200.)

52.    As an invoice reviewer on the Exxon Valdez Project, Coco's duties included verifying overtime calculations and required an understanding of employers' legal obligation to pay certain employees overtime compensation. (May 17, 2005 Tr. at 57-59, 135-36.)[16]

### D.    Wells Hann

53.    In September of 1996, Wells Hann went to work for Travelers in Pittsburgh, Pennsylvania. (May 16, 2005 Tr. at 203-206.) In connection with his employment at Travelers, Wells Hann received an employee handbook on September 3, 1996. (Id. at 204; Def. Exs. Q&V.) The handbook specifically references the Fair Labor Standards Act and the requirement that non-exempt employees be paid time and a half for hours worked in excess of 40 in any week. (May 16, 2005 Tr. at 204-205; Def. Ex. Q at 32.) This information virtually mirrors the overtime information contained in the FLSA Notice in effect at the time Hann worked on the Exxon Valdez Project. (Def. Ex A.) In addition, since 1996 when Wells Hann started with Travelers, the FLSA Notice has been posted in at least four locations in the office where Hann worked. (May 19, 2005 Tr. at 59-60.)

### E.    Billy Myers

54.    Plaintiff Billy Myers had knowledge of the Fair Labor Standards Act as President of Underwood Building Supplies ("Underwood") -- a $10 million a year family business with over 100 employees operating in Florida, Alabama and Mississippi. (May 16, 2005 Tr. at 108, 123-27.) In addition to serving as President, Myers was also a forty (40) percent owner of Underwood while employed there in the early 1980s. (Id.) As President of Underwood, Myers

---

[16]  As stated above, Mr. Coco is deceased and his claims are being pursued by his widow Elda Coco. Plaintiffs presented no evidence that Coco lacked knowledge of his FLSA rights, or that he exercised diligence in the pursuit of his claims.

was responsible for Underwood's compliance with all federal laws and, during the time he was President, Myers complied with the FLSA, including posting the FLSA Notice.  (Id. at 126-27.)

55.    Myers also worked for Crawford and Company in several offices, unrelated to the offices at issue in this action, where Crawford posted the FLSA notice.  Myers worked from Crawford's Los Angeles, California branch office where the FLSA Notice was posted in 1986.  (Id. at 129-130; May 19, 2005 Tr. at 186-87.)  Myers also attended 4 to 6 weeks of training at Crawford's corporate headquarters in Atlanta, Georgia in the late 1980s and ate meals in the Crawford cafeteria at the corporate headquarters.  (May 16, 2005 Tr. at 130-131.)  The FLSA Notice was conspicuously posted in the Crawford training rooms, classrooms and in the cafeteria during this time.  (May 19, 2005 Tr. at 160, 168-69, 196-98.)

### F.    Floyd King

56.    As one of Crawford's "Core Catastrophe Adjusters," Floyd King attended a meeting at Crawford's headquarters in Atlanta, Georgia during the annual Core Adjusters meeting in 1993. (May 16, 2005 Tr. at 40-41.)[17]  During this meeting in an open discussion with thirty or more Core Adjusters, the adjusters discussed with Crawford managers the question of whether they were entitled to overtime compensation under the FLSA.  (Id. at 74-75.)

57.    King also worked for Crawford in several offices where Crawford posted the FLSA notice.  King worked for Defendant in the Jacobs Building on the Ashland Project where Crawford conspicuously posted the FLSA notice while King worked there.  (Id. at 51, 62, May 17, 2005 Tr. at 148-149, 173-175; Def. Exs. A, L-1.)  King also worked in Crawford's Pittsburgh branch office in 1994, Crawford's Culver City, California branch office in the 1980s and on a superfund project for Crawford in the early 1990s.  (May 16, 2005 Tr. at 63-65.)  The FLSA was

---

[17]  Core Adjusters are a select group of catastrophe adjusters who work exclusively for Crawford and who are the first called by Crawford for catastrophe assignments.  (May 16, 2005 Tr. at 39-40.)

posted in each of these offices in conspicuous locations. (May 19, 2005 Tr. at 68-73, 81-83; & 186.)

58.    King's duties adjusting business interruption claims for Crawford on the Ashland and Exxon Valdez Projects required him to understand overtime compensation. (Id. at 54.)

> Q    So, on business interruption claims, to investigate those, you had to have at least some knowledge of the fact that when people worked over 40 hours, they were required by law to be paid time and a half?
> A    Right.
> Q    And that was true not only on the Ashland Project, but that was also true when you were working out in Alaska, correct?
> A    Yes.

(Id. at 54-55.)

59.    In addition to each Plaintiff having knowledge of the FLSA more than three years before filing suit, Plaintiffs failed to produce any evidence that they exercised reasonable diligence in the pursuit of their claims.

## CONCLUSIONS OF LAW

**I.    Plaintiffs' Claims**

1.    As set forth above, the timeframes for which Plaintiffs seek recovery range from April, 1989 to January, 1992. The last alleged claim in this case accrued in January 1992.

**II.    Statute of Limitations**

2.    All Plaintiffs, except Radigan, filed suit on September 21, 2000. Plaintiffs amended the Complaint to add Radigan's claims on September 26, 2000.

3.    The statutes of limitations for FLSA overtime claims are two years and three years for willful violations. 29 U.S.C. § 255(a).

4.      Because the most recent claim at issue in this case accrued in January 1992 (more than

eight years before Plaintiffs brought their claims) all of Plaintiffs' claims are barred by even the

more generous three-year statute of limitations for willful violations.

5.      Therefore, unless Plaintiffs can demonstrate that the doctrine of equitable tolling applies

and tolls the statute of limitations from the dates they worked on the four Projects at issue until at

least three years before the dates they filed suit, their claims must be dismissed as untimely.[18]

### III.    Equitable Tolling

6.      The burden of proving facts to justify the doctrine of equitable tolling rests with

Plaintiffs.  Courtney v. La Salle University, 124 F.3d 499, 505 (3d Cir. 1997).  "The primary

consideration underlying statutes of limitations is that of fairness to the defendant."  Meyer v.

Riegel Products Corp., 720 F.2d 303, 308-09 (3d Cir. 1983).

7.      The Third Circuit has held that equitable tolling is appropriate only when: (1) the

defendant has actively misled the plaintiff; (2) the plaintiff has "in some extraordinary way" been

prevented from asserting his rights; or (3) plaintiff timely asserted his rights in the wrong forum.

Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994).

8.      In this case, Plaintiffs' sole basis for equitable tolling is Crawford's alleged failure to

comply with the FLSA Notice requirement set forth under 29 C.F.R. § 516.4 on the Projects at

issue in this case.

9.      An employer's failure to post a required employment notice can toll a limitations period,

but only "until such time as the aggrieved person seeks out an attorney or acquires actual

knowledge of his rights. . ."  Bonham v. Dresser Indus., 569 F.2d 187, 193 (3d Cir. 1977).

---

[18]  Plaintiffs have not proved a willful violation, but even if they had, the application of a three year statute of
limitations versus a two year statute of limitations does not alter the outcome of Plaintiffs' claims.  As detailed in
Section III.C., infra, each Plaintiff had knowledge of the FLSA at or near the time they worked on the projects at
issue in this case and, in any event, at least three years before they filed their respective claims.  Accordingly, even
with the benefit of the longer three year statute of limitations, each of the Plaintiffs' claims are time-barred.

Moreover, the absence of a required employment notice alone is not sufficient to toll the statute of limitations.  Plaintiffs must establish the existence of other equitable factors favoring tolling, including: (1) prejudice to plaintiff caused by the absence of the required notice; (2) reasonable diligence by plaintiff in the pursuit of his or her claims; and (3) the absence of any prejudice to defendant as a result of plaintiff's delay.  See Podobnik v. U.S. Postal Svc., 409 F.3d 584, 592-593 (3d. Cir. May 5, 2005) (affirming Chief Judge Ambrose, and holding that plaintiff's diligent pursuit of claims and prejudice to Plaintiff from alleged absence of required notice are prerequisites for equitable tolling); Hammer v. Cardio Med. Prod., Inc., 131 Fed. Appx. 829, 832 (3d Cir. May 18, 2005) (holding that tolling based on alleged lack of required notice is "fact-intensive test involving several 'equitable factors'" that plaintiff must demonstrate); Baldwin County Welcome Center v. Brown, 466 U.S. 147, 151-52 (1984) (holding that "once a factor that might justify . . . tolling is identified" absence of prejudice to defendant is a factor to considered in determining whether to apply equitable tolling"); Callowhill v. Allen-Sherman-Hoff Co., Inc., 832 F.2d 269, 272 (3d Cir. 1987) (applying equitable tolling for failure to post notice under narrow circumstances of case where defendant was not prejudiced because it knew of claims before limitations period expired).

10.    In this case, Plaintiffs' equitable tolling argument fails because: (1) Plaintiffs have failed to demonstrate a failure to post FLSA Notices on the Projects for which they assert claims; (2) Plaintiffs have failed to demonstrate the existence of other equitable factors warranting equitable tolling; and (3) Plaintiffs' knowledge of their rights under the FLSA precludes equitable tolling.

### A.    Crawford's Compliance With FLSA Notice-Posting Requirements

11.    Plaintiffs have not demonstrated, by a preponderance of the evidence, that Crawford failed to comply with 29 C.F.R. § 516.4 on the Projects at issue in this case.  The FLSA requires

employers to post notices in conspicuous locations in "establishment[s]" where its employees are employed. See 29 C.F.R. § 516.4. An employer's establishment is synonymous with its "place of business." Walker v. Washbasket Wash & Dry, No. Civ. A. 99-4878, 2001 WL 770804, at *13 (E.D. Pa. 2001) (interpreting 29 C.F.R. § 516.4 as requiring posting at the employer's "place of business"); see also 29 C.F.R. §§ 570.109, 779.23 (defining "establishment" as a "distinct physical place of business" and noting that courts should consider the "manner of operation and control of the business" when determining whether a particular location constitutes an "establishment"). A plaintiff seeking to toll the statute of limitations "must actually testify that he or she observed the bulletin board and the notices were not there. . . . It is not sufficient for a plaintiff to merely deny any knowledge of whether such a notice was hung where defendant claims or anywhere else." Petty v. Merck & Co., No. 99-CV-6555, 2003 WL 22797158, at *4 (E.D. Pa. 2003); see also Byers v. Follmer Trucking Co., 763 F.2d 599, 601 (3d Cir. 1985) (rejecting plaintiffs' equitable tolling argument where plaintiffs merely testified that they had never seen required notices on employer's property); Butz v. Hertz Corp., 554 F. Supp. 1178, 1182 (W.D. Pa. 1983) (rejecting equitable tolling argument based on allegation that plaintiffs did not see notices).

12.    With respect to the Projects that occurred in the Pittsburgh area (Ashland, Uni-Mart and Buckeye), Plaintiffs have not demonstrated that Crawford failed to post required FLSA Notices in its establishments on those Projects. Whereas Crawford presented definitive evidence that it conspicuously posted the FLSA Notice in its establishments on the Ashland Oil and Uni-Mart Projects, Plaintiffs merely contend that they do not know whether FLSA Notices were posted. As for the Buckeye Project, neither side presented definitive evidence concerning the presence or absence of the FLSA Notice. However, the evidence of record reflects that Plaintiffs who

worked on the Buckeye Project checked-in at and had access to the Jacobs Building Office where the FLSA Notice was conspicuously displayed.  Further, Crawford mailed the revised 1990 FLSA Notice to all U.S. locations approximately one month after the Buckeye Project commenced in April of 1990.  Given these facts, Plaintiffs have not proved the absence of a FLSA Notice on the Buckeye Project by a preponderance of the evidence.[19]  In sum, Plaintiffs have not met their burden of proving that Crawford failed to post the required FLSA Notice on the Ashland, Uni-Mart and Buckeye Projects.  Accordingly, equitable tolling does not apply and the claims of the Plaintiffs who worked on these Projects - Floyd King, Billy Myers, Wells Hann, and Doug Radigan - are dismissed as untimely.

13.    Crawford also complied with the FLSA Notice requirement on the Exxon Valdez Project. Exxon -- which operated and controlled the locations where Plaintiffs worked on the Project -- conspicuously posted the required FLSA Notice on the multi-employer worksites in the Exxon Valdez Command Center, the EB-2, the Exxon claims office in the Calais Building and in the Exxon claims office in Kenai, Alaska where Plaintiffs worked during the Exxon Valdez Project. A recent DOL Opinion Letter states that, if employees of one company are "working in another employer's office on a multi-employer worksite, and the FLSA notice is already conspicuously posted in compliance with section 516.4, no additional posting of this notice is required."  DOL Wage and Hour Op. Ltr. (March 3, 2003) at Def. Ex. Z; see also Schoch v. Fieldcor, Inc., No. 86-3981, 1988 U.S. Dist LEXIS 986, at * 9-11 (E.D. Pa. Feb. 3, 1988) (finding that posting of

---

[19]  Even if Plaintiffs had presented sufficient evidence that Crawford failed to post the FLSA Notice on the Buckeye Project, each of the Plaintiffs who worked on that Project (King, Myers and Radigan) all worked on other Crawford Projects where the FLSA Notice was indisputably posted.  Therefore, the purported absence of the FLSA Notice on the Buckeye Project did not prejudice these Plaintiffs in any way and, for this additional reason, does not provide a basis for equitable tolling.  See Callowhill, 832 F.2d at 272 n.3 (stating that an employee who has the knowledge provided by the ADEA notice would not be entitled to a tolling period, as the employer's failure to post the notice would not have prejudiced the employee).  Furthermore, this outcome is consistent with Chief Magistrate Judge Caiazza's June 13, 2003 Order in the related matter Archer v. Crawford.  In that case, Judge Caiazza found that Crawford posted the FLSA Notice on the Ashland Oil Project and, on that basis, dismissed all claims (including those relating to other projects) asserted by Plaintiffs who worked on the Ashland Oil Project.

another employer in the same facility as defendant satisfied the FLSA notice requirement). The

Court finds that the DOL's interpretation of the posting requirement on multi-employer

worksites is entitled to deference under Auer v. Robbins, 519 U.S. 452, 461 (1997) and

Christensen v. Harris County, 529 U.S. 576, 587-588 (2000). In addition, even if the FLSA

Notices had not been posted, 29 C.F.R. § 516.4 did not obligate Crawford to post the FLSA

Notices because the Exxon worksites were not Crawford "establishments" within the meaning of

29 C.F.R. § 516.4. Further, Crawford presented evidence that it staged its operations related to

the Exxon Valdez Project from its Home Office in Atlanta, Georgia where the FLSA Notice was

conspicuously posted throughout the duration of the Exxon Valdez Project. On this additional

basis, Plaintiff's equitable tolling argument fails as a matter of law.

14.     Accordingly, the Court finds that Crawford complied with the FLSA Notice requirements

on the Exxon Valdez Project and that there is no basis for tolling the statute of limitations with

respect to that Project.

## B.     Other Equitable Considerations

15.     Even if Plaintiffs had proved that Crawford failed to comply with the FLSA Notice

requirements, equitable tolling would still be inappropriate because Plaintiffs have failed to

present evidence that other equitable factors favor equitable tolling.

16.     As an initial proposition, Plaintiffs failed to establish by a preponderance of the evidence

that they were prejudiced by the alleged absence of FLSA Notices on the Projects at issue. To

the contrary, and as discussed in more detail below, Plaintiffs had knowledge of the FLSA more

than three years before bringing their claims, which precludes a finding that Plaintiffs were

prejudiced by the alleged absence of FLSA Notices on the Projects at issue. Podobnik, 409 F.3d

at 593 (stating "[t]he absence of an EEOC notice did not prejudice [plaintiff], and as such is no basis to toll the limitations period").

17.     Also fatal to Plaintiffs' equitable tolling argument is their failure to present any evidence that they pursued their claims with reasonable diligence.  "[R]unning throughout equitable estoppel cases is the obligation of the plaintiff to exercise due diligence to preserve his or her claim."  Podobnik, 409 F.3d at 592; see also Halliburton NUS Corp., 111 F.3d 1116, 1126 (3d Cir. 1997) (rejecting equitable tolling where plaintiff failed to demonstrate that it exercised reasonable diligence in investigating and bringing claims).  In fact, Plaintiff Doug Radigan testified that he delayed bringing his claims because he was not satisfied that he would prevail on his claims until he learned about the outcome of another lawsuit against Crawford.  (May 17, 2005 Tr. at 39.)  However, "[t]he running of the statute of limitations period will not await the plaintiff's satisfaction as to the merits of his or her case."  Forbes v. Eagelson, 19 F. Supp. 2d 352, 376 (E.D. Pa. 1998); Gruca v. United States Steel Corp., 495 F.2d 1252, 1259 (3d Cir. 1974) (holding "[o]ne cannot sit back, wait years for someone else to act as his stalking horse, and then ride the coattails of a favorable judicial decision irrespective of the delay involved").

18.     Finally, Plaintiffs have failed to show that their delay did not result in prejudice to Crawford.  Given that "[t]he primary consideration underlying statutes of limitations is that of fairness to the defendant," Plaintiffs' failure in this regard further belies Plaintiffs' equitable tolling argument.  Meyer, 720 F.2d at 308-09; see also Baldwin, 466 U.S. at 151-52 (1984) (holding that "once a factor that might justify . . . tolling is identified" absence of prejudice to defendant is a factor to considered in determining whether to apply equitable tolling");  Callowhill, 832 F.2d at 272 (applying equitable tolling for failure to post notice under narrow circumstances of case where defendant was not prejudiced because it knew of claims before

limitations period expired).  Indeed, the prejudice to Defendant is clearly evidenced by the death

of Plaintiff James Coco whose death years after the Exxon Valdez Project deprived Crawford of

the opportunity to develop and present evidence concerning Coco claims at trial.

### C.    Plaintiffs' Independent Knowledge Of The FLSA

19.    Assuming Plaintiffs had demonstrated that equitable tolling should apply, tolling applies

only "until such time as the  aggrieved person seeks out an attorney or acquires actual knowledge

of his rights . . ."  Bonham v. Dresser Indus., 569 F.2d 187, 193  (3d Cir. 1977).  While a plaintiff

must have more than a general knowledge of overtime requirements to stop the tolling of the

statute of limitations, the precise level of knowledge is not high.  Indeed, the minimum level of

knowledge required is certainly no more than the information contained in the FLSA Notice.

See Padobnik, 409 F.3d at 592-593 (holding that "the absence of an EEOC Notice did not

prejudice him, and as such is no basis to toll the limitations period"); see also Callowhill, 832

F.2d at 272 n.3 (stating that an employee who has the knowledge provided by the ADEA notice

would not be entitled to a tolling period).  In this case, Plaintiffs failed to demonstrate by a

preponderance of the evidence that they lacked knowledge of their rights under the FLSA.  To

the contrary, and as detailed below, the record reflects that each Plaintiff had sufficient

knowledge of his rights under the FLSA to preclude equitable tolling.

### 1.    Ed Hann

20.    Between 1972 and 1996, Ed Hann was the owner of four businesses engaged in interstate

commerce that had as many as 16 employees and generated gross annual revenues of between

$300,000 and $1 million.  (May 16, 2005 Tr. at 165-67.)  As the owner of these businesses it was

Hann's responsibility to comply with wage and hour laws, which Hann admits he did.  (Id.)

Indeed, a plaintiff who owns a business with employees is presumed to have knowledge of the

FLSA and its potential applicability to his business. See TWA v. Thurston, 469 U.S. 111, 128, 105 S. Ct. 613, 625 (1985) (because "employers are required to post ADEA notices, it would be virtually impossible to show that he was unaware of the Act and its potential applicability"); Hodgson v. Heard, No. 1383, 1972 WL 960, at *2 (N.D. Ga. 1972) (holding that except as to "the most ignorant unsophisticated businessman . . . FLSA is a well known business fact of life"). Thus, Crawford is entitled to a presumption that Hann had (or should have had) knowledge of the FLSA.

21.    Similarly, apart from his status as a business owner, Hann's admission that he complied with wage and hour laws while operating those businesses demonstrates sufficient knowledge to start the statute of limitations running. See Reifinger v. Nuclear Research Corp., No. 92-5999, 1992 WL 368347, at *3 (E.D. Pa. 1992); McClinton v. Alabama By-Products Corp., 743 F.2d 1483, 1485 n.3 (11th Cir. 1984); Draeger v. Jockey International, Inc., 583 F. Supp. 570, 571-2 (S.D.N.Y. 1984).

22.    Additionally, Hann's receipt of employment handbooks from Traveler's which specifically informed him of overtime requirements and the FLSA more than three years before bringing this action provided him with knowledge of his rights sufficient to start the statute of limitations running. See Mercado v. The Ritz-Carlton San Juan Hotel, Spa and Casino, 410 F.3d 41, 49 (1st Cir. May 31, 2005) (receipt of handbooks containing information regarding employment laws may provide sufficient knowledge); Malinowski v. State Farm Mut. Auto Ins. Co., No. 77-129, 1978 WL 188, at *2 (W.D. Pa. 1978) (stating that receipt of training manuals provided actual knowledge of rights). The handbooks contain information that is virtually identical to that provided in the FLSA Notice, thus eliminating any prejudice to Hann from the

alleged absence of FLSA Notices.  See Callowhill, 832 F.2d at 272, n.3; Podobnik, 409 F.3d at 593.

23.    Hann also obtained knowledge of the FLSA by virtue of the numerous FLSA Notices posted throughout the Travelers office where he worked beginning in October of 1996.  A Plaintiff who works from, or regularly visits, another location where the FLSA Notice is posted-- whether with the defendant employer or another employer--obtains knowledge of his rights sufficient to commence the statute of limitations running.  See Cortez v. Medina's Landscaping, No. 00 C 6320, 2002WL 31175471, at *4 (N.D. Ill. Sept. 30, 2002) (adopting Bonham and holding that a showing that the plaintiff-employee worked for another employer who complied with the notice requirement would suffice to demonstrate knowledge); Clark v. Resistoflex Co., 854 F.2d 762, 768 (5th Cir. 1988) (recognizing that plaintiff-employee's regular visits to office where Notice was posted provided sufficient knowledge despite absence of notice in location where he worked); Malinowski, 1978 WL 188, at *2 (holding that visits to regional office where notice was posted provided plaintiff with knowledge of rights); Moss v. Crawford & Co., 98-CV-1350 (W.D. Pa.) (dismissing all FLSA claims of plaintiffs based on evidence of posting in one location where plaintiff worked).

24.    Finally, Hann's significant experience handling business interruption claims, which require a basic understanding of an employer's legal obligation to pay overtime compensation to certain employees provided him with knowledge to preclude equitable tolling in this case.  See Malinowski, 1978 WL 188, at *2 (noting that training and job responsibilities can provide knowledge sufficient to preclude tolling); Glass v. IDS Financial Svcs., 778 F. Supp. 1029, 1047 (D. Minn. 1991) (holding plaintiff was aware of rights by virtue of education and training).

2.    Doug Radigan

25.    Radigan's testimony that he has had actual knowledge of the same information contained in the FLSA Notice since the 1980's forecloses his equitable tolling argument.  See Bonham, 569 F.2d at 193; Callowhill, 832 F.2d at 272, n.3 (stating that an employee who has the knowledge provided by the ADEA notice would not be entitled to a tolling period); Podobnik, 409 f.3d at 5913.

26.    Similarly, Radigan worked from several Crawford offices where FLSA Notices were indisputably posted, including offices in Atlanta, Wilmington, Ft. Lauderdale, San Francisco and Pittsburgh, more than three years before Radigan filed suit.  By routinely working from locations where Crawford posted the FLSA Notice, Radigan obtained knowledge of the FLSA and, thus, cannot toll the statute of limitations.  Malinowski, 1978 WL 188, at *2 (holding that visits to regional office where notice was posted provided plaintiff with knowledge of rights); Moss, 98-CV-1350 (dismissing all FLSA claims of plaintiffs based on evidence of posting in one location where plaintiff worked).

27.    Radigan also obtained knowledge of the FLSA through his duties as an adjuster, monitor and invoice reviewer for Crawford.  Each of these functions, which required an understanding of overtime compensation, provided Radigan with knowledge of the FLSA more than three years before he filed suit.  See Malinowski, 1978 WL 188, at *2 (noting that training and job responsibilities can provide knowledge sufficient to preclude tolling); Glass, 778 F. Supp. at 1047) (holding plaintiff was aware of rights by virtue of education and training).

3.    James Coco

28.    Coco obtained knowledge of the FLSA, which precludes equitable tolling, based upon his job responsibilities and his work in a Crawford office where Crawford posted the FLSA Notice.

Coco's responsibilities on the Exxon Valdez Project required him to verify overtime calculations and to have an understanding of an employer's legal obligation to pay certain employees overtime compensation. (May 17, 2005 Tr. at 57-59, 135-36.)  In addition, during his 1989 and 1990 assignment on the Hurricane Hugo Project, Coco worked in a Crawford office where the FLSA Notice was conspicuously displayed.  (May 19, 2005 Tr. at 169-71, 200.) See Malinowski, 1978 WL 188, at *2 (holding that job responsibilities and visits to regional office where notice was posted provided plaintiff with knowledge of rights); Moss, 98-CV-1350 (dismissing all FLSA claims based on posting in one location where plaintiff worked).

       4.    Wells Hann

29.     In connection with his employment at Travelers, Wells Hann received an employee handbook on September 3, 1996, which specifically referenced the FLSA and the requirement that non-exempt employees be paid time and a half for hours worked in excess of 40 in any week.  (May 16, 2005 Tr. at 204-205; Def. Ex. Q at 32; Def. Ex. V.)  The handbook contains information that is virtually identical to that provided in the FLSA Notice, thus eliminating any prejudice to Hann from the alleged absence of FLSA Notices.  See Callowhill, 832 F.2d at 272 n.3; Podobnik, 409 F.3d at 593.  Hann's receipt of this employee handbook provided him with knowledge of the FLSA sufficient to start the statute of limitations running more than three years before he brought this action.  See Mercado, 410 F.3d at 49 (receipt of handbook containing information regarding employment laws may provide knowledge);  Malinowski, 1978 WL 188 at *2 (stating that receipt of training manuals provided actual knowledge of rights).

30.     Hann also obtained knowledge of the FLSA by virtue of the numerous FLSA Notices posted throughout the Travelers office where he worked since September of 1996.  A Plaintiff who works from, or regularly visits, another location where the FLSA Notice is posted--whether

with the defendant employer or another employer--obtains knowledge of his rights sufficient to commence the statute of limitations running.  See Cortez, 2002WL 31175471 at *4 (adopting Bonham and holding that a showing that the plaintiff-employee worked for another employer who complied with the notice requirement would suffice to demonstrate knowledge); Clark, 854 F.2d at 768 (recognizing that plaintiff-employee's regular visits to office where Notice was posted provided sufficient knowledge despite absence of notice in location where he worked); Malinowski, 1978 WL 188, at *2 (holding that visits to regional office where notice was posted provided plaintiff with knowledge of rights); Moss v. Crawford, 98-CV-1350 (W.D. Pa.) (dismissing all FLSA claims based on posting in one location where plaintiff worked).

   5. Billy Myers

31. Prior to becoming an adjuster in 1983, Myers was President and part owner of Underwood Building Supplies - a $10 million a year family business with over 100 employees operating in Florida, Alabama and Mississippi.  (May 16, 2005 Trial Tr. at 107-08, 123-127.)  In that capacity, Myers was responsible for Underwood's compliance with all federal laws, including the FLSA.  (Id. at 126-27.)  This experience provided Myers with knowledge of the FLSA sufficient to preclude equitable tolling.  Indeed, a plaintiff who owns a business with employees is presumed to have knowledge of the FLSA and its potential applicability to his business.  See TWA v. Thurston, 469 U.S. at 128 (because "employers are required to post ADEA notices, it would be virtually impossible to show that he was unaware of the Act and its potential applicability"); Hodgson, 1972 WL 960 at *2 (holding that except as to "the most ignorant unsophisticated businessman . . . FLSA is a well known business fact of life").

32. Similarly, apart from his status as a business owner, Myers' admission that he complied with wage and hour laws demonstrates sufficient knowledge to start the statute of limitations

running.  See Reifinger, No. 92-5999, 1992 WL 368347, at *3 (E.D. Pa. 1992); McClinton, 743

F.2d at 1485, n.3; Draeger, 583 F. Supp. At 571-2.

33.    Finally, during the 1980's, Myers also worked for Crawford in at least two additional

Crawford offices (Los Angeles and the Atlanta Home Office) where Crawford posted the FLSA

Notice.  (Id. at 129-131; May 19, 2005 Tr. at 160, 168-69, 186-87, 196-98.)  By working from

locations where Crawford posted the FLSA Notice, Myers obtained knowledge of the FLSA and,

thus, cannot toll the statute of limitations.  Malinowski, 1978 WL 188, at *2 (holding that visits

to regional office where notice was posted provided plaintiff with knowledge of rights); Moss,

98-CV-1350 (dismissing all FLSA claims of plaintiffs based on evidence of posting in one

location where plaintiff worked).

        6.    Floyd King

34.    King's significant experience handling business interruption claims, which he admits

requires an understanding of an employer's legal obligation to pay overtime compensation to

certain employees, provided him with knowledge sufficient to preclude equitable tolling in this

case.  (May 16, 2005 Tr. at 54-55); see Malinowski, 1978 WL 188, at *2 (noting that training

and job responsibilities can provide knowledge sufficient to preclude tolling); Glass, 778 F.

Supp. at 1047 (holding plaintiff was aware of rights by virtue of education and training).

35.    Additionally, during the 1980's and early 1990s, King worked for Crawford in

Crawford's Culver City branch office, in the Jacobs building on the Ashland Project, at

Crawford's home office in Atlanta, Georgia and in Crawford's Pittsburgh branch office where

Crawford posted the FLSA Notice.  By working from locations where Crawford posted the

FLSA Notice, King obtained knowledge of the FLSA and, thus, cannot toll the statute of

limitations.  Malinowski, 1978 WL 188, at *2 (holding that visits to regional office where notice

was posted provided plaintiff with knowledge of rights); <u>Moss</u>, 98-CV-1350 (dismissing all

FLSA claims of plaintiffs based on evidence of posting in one location where plaintiff worked).

King also worked for Crawford in Exxon's offices on the Exxon Valdez Project and for

Crawford on a superfund project in Arizona where Exxon and the state of Arizona, respectively,

posted the FLSA notice.  <u>See</u> <u>Cortez</u>, No. 00 C 6320, 2002WL 31175471, at *4 (proof that

another employer posted the notice provides knowledge).

36.    Finally, King attended the Crawford Core Adjusters meeting at Crawford's headquarters

in Atlanta, Georgia in 1993 when overtime was discussed.  (May 16, 2005 Tr. at 40-41 & 74-75.)

King obtained knowledge of overtime from his attendance at this Core meeting.  <u>See</u> <u>Sonnier v.</u>

<u>Crawford & Co.</u>, 94-CV-1755 (W.D. Pa.) (finding that plaintiff obtained knowledge of rights by

talking to another adjuster about overtime complaints).

37.    The forgoing facts support a finding that each Plaintiff had knowledge of his rights under

the FLSA more than three years before filing suit.  Thus, equitable tolling does not apply and

Plaintiffs' untimely claims are due to be dismissed.  <u>See</u> <u>Bonham</u>, 569 F.2d at 193.

## IV.    **Plaintiffs Ed Hann, Billy Myers And Doug Radigan's Positions Are Exempt Under The FLSA**[20]

38.    Plaintiffs Ed Hann, Billy Myers and Doug Radigan were employed in bona fide

administrative positions on the Projects at issue in this case.  <u>See</u> 29 U.S.C. § 213(a)(1); 29

C.F.R. § 541.1-.2.  To come within the FLSA administrative exemption, Plaintiffs must satisfy

both the "salary basis" and the "duties test."  <u>See</u> 29 C.F.R. § § 541.1-.2; <u>see also</u> <u>Auer v.</u>

<u>Robbins</u>, 519 U.S. 452, 454 (1997).

---

[20]  Plaintiffs Wells Hann, James Coco and Floyd King were also exempt employees under the FLSA.  However, due to the passage of time, lost documents and faulty memories of distant events, the evidence regarding how these individuals were paid is not as clear.  Wells Hann and King could not remember exactly how they were paid, and Coco could offer no testimony because he is deceased.  Therefore, the record is not fully developed with respect to their pay and duties.  However, given that Wells Hann's, Coco's and King's claims are untimely (just like Radigan, Myers and Ed Hann), the Court need not reach the merits of their claims.

39.    Plaintiffs conceded that they satisfied the "duties test," but argue that they are non-exempt because they were paid on a salary basis.  (May 17, 2005 Trial Tr. at 94-95 ("we're not going to the duties basis test.  We are going on 541 Section 118(a), which is the salary basis test."))  Regardless, Plaintiffs Ed Hann, Myers and Radigan are exempt from the overtime requirements of the FLSA because they not only fulfilled the duties test, but also the salary basis test under the FLSA administrative exemption.

40.    The regulations state that an employer pays an employee "on a salary basis" if:

> he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. . . . <u>This policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work</u>.

29 C.F.R. § 541.118 (emphasis added).

41.    Under the regulations, a "minimum guarantee plus extras" meets the "salary basis" test even though only a part of the compensation constitutes a "predetermined amount."  29 C.F.R. § 541.118(b).  "In other words, additional compensation besides the salary is not inconsistent with the salary basis of payment."  <u>Id.</u>  Paying a guaranteed minimum plus a commission meets the salary basis requirement.  <u>Id.</u>; <u>Brock v. Claridge Hotel and Casinos</u>, 846 F.2d 180, 184 (3d Cir. 1988); <u>Alley v. Comella</u>, 241 F. Supp. 1016, 1019-20 (W.D. Pa. 1965); <u>Edmund v. Crawford & Co.</u>, Civ. A. File No. 1:95-CV-1310 at 19 (N.D. Ga. 1997).

42.    Here, Plaintiffs Ed Hann, Myers and Radigan were paid a minimum guarantee of $800 a week plus commissions.  They initially received 45 percent of what Crawford billed to Exxon for their work each week with a minimum guarantee of $800 per week on the Exxon Valdez Project.  (May 16, 2005 Tr. at 139 & 179; May 17, 2005 Tr. at 26-27.)  Additionally, when and if Crawford collected the full amount of the bill from Exxon, Ed Hann, Myers and Radigan

received an additional 5 percent of what was originally billed to Exxon for their work each week. Thus, they received up to fifty percent of what Crawford collected from Exxon for their time billed worked on the Exxon Valdez Project.  (May 16, 2005 Tr. at 56-57, 141; May 17, 2005 Tr. at 26.)  There is no evidence that Plaintiffs were subject to any deductions below the $800 minimum guarantee or that the guarantee was illusory.  See, e.g., Claridge, 846 F.3d at 183-186 (a minimum guarantee plus extras pay method which is subject to improper deductions and which is tied exclusively to hours worked and not to commission, bonuses, or daily or shift pay is illusory and does not satisfy the salary basis test).  As a result, Plaintiffs met the "salary basis" test under 29 C.F.R. § 541.118(b) on the Exxon Valdez Project.

43.    Myers and Radigan, who also worked on the other Projects at issue, testified they were paid in the same manner on the other Projects as they were on the Exxon Valdez Project.  (May 16, 2005 Tr. at 138 (Myers - the Buckeye Pipeline); May 17, 2005 Tr. at 32 (Radigan - Uni-Mart and Buckeye Projects.)  As a result, Plaintiffs Myers and Radigan were likewise paid on a "salary basis" under 541.118(b) on those Projects.

44.    In addition to Plaintiffs' concession that they performed duties falling within the FLSA administrative exemption, the evidence of record leads to the same conclusion.  In order to satisfy the job duties test of the administrative exemption, Defendant must demonstrate for each Plaintiff that: (1) "his primary duty consisted of either the performance of office or non-manual work directly related to management policies or general business operations of the employer;" and (2) "the performance of such primary duty includes work requiring the exercise of discretion and independent judgment."  29 C.F.R. § 541.214(a).

45.    As an initial proposition, it is well-established that claims adjusters normally perform the duties of an exempt administrative employee.  29 C.F.R. § 205(c)(5).  Indeed, courts, "[t]he

regulations and the Wage-Hour Administrator have specifically interpreted and identified

'insurance claims adjusters' as qualifying as an exempt administrative employee." Edmund v.

Crawford, No. 195-CV-1310, 1997 WL 33330959, at *9 (N.D. Ga. 1997) (citing 29 C.F.R.

§ 541.205(c)(5); Wage and Hour Opinion Letter No. 563 (March 14, 1967)); see also Blinston v.

Hartford Accident and Indemnity Co., 441 F.2d 1365, 1366-67 (8th Cir. 1971) (affirming lower

court determination that insurance adjuster fell within administrative exemption).  Moreover, the

Wage-Hour Administrator has recently issued another opinion letter explaining how claims

adjusters are exempt administrative employees.  See Wage and Hour Opinion Letter signed by

Tammy McCutchen, Wage and Hour Administrator, dated November 19, 2002; see also

Jastremski v. Safeco Ins. Co., 243 F. Supp. 2d 743, 753 (N.D. Ohio 2003) (adopting McCutchen

letter and finding insurance adjuster exempt).  Finally, numerous courts have determined that

claims adjusters are exempt employees under the FLSA.  See, e.g., Munizza v. State Farm Mut.

Auto. Ins. Co., No. 95-35794, 1996 WL 711563, at *4 (9th Cir. Nov. 7, 1997) (insurance adjuster

exempt); Palacio v. Progressive Ins. Co., 244 F. Supp. 2d 1040, 1047 (C.D. Cal. 2002) (same);

Camp v. Progressive Corp., No. Civ. A. 01-2680, 2004 WL 2149079, at * 9-14 (E.D. La. 2004)

(explaining how insurance adjusters are exempt administrative employees).

46.    Ed Hann, Myers and Radigan performed adjusting, auditing or invoice review work on

the Projects at issue.  These job duties constitute office or non-manual work directly related to

management policies or general business operations of Defendant on environmental pollution

catastrophe projects.  (May 17, 2005 Tr. at 113-14, 117.)

47.    They also exercised discretion and independent judgment in the fulfillment of these

duties.  Ed Hann performed traditional insurance adjusting duties with little to no oversight.

(May 16, 2005 Tr. at 176-177.)  Ed Hann developed the process for handling the claims,

investigated, evaluated, negotiated and recommended settlement of claims between $10,000 and $200,000. (Id.) Furthermore, Ed Hann's recommended settlements were almost always accepted. (Id. at 177.) Ed Hann's duties on the Exxon Valdez Project satisfy the duties test under the administrative exemption. Billy Myers duties on both the Exxon and Buckeye Projects also satisfied the administrative duties test. Myers performed auditing functions for the first few months on the Exxon Valdez Project and spent his remaining time on that Project performing traditional claims adjusting work. (Id. at 136.) On the Buckeye Project Myers adjusted business interruption, municipal and medical claims. (Id. at 143.) In performing his adjusting duties, he also recommended settlements which were almost always accepted. (Id.) These duties satisfy the requirements of the administrative exemption under the FLSA. Doug Radigan worked as a monitor on the Exxon Valdez Project and as a claims adjuster on the Uni-Mart and Buckeye Projects adjusting business interruption and lost wage claims. (Id. at 5, 30, 36, 125-129.) These duties satisfy the requirements of the administrative exemption under the FLSA.

## V.    <u>Conclusion</u>

48¶ .    In conclusion, the Court finds that Plaintiffs' claims are barred by the statute of

limitations, and that Plaintiffs have failed to demonstrate that the doctrine of equitable tolling

should extend the statute of limitations in this case.  The Court also finds that Plaintiffs Ed Hann,

Billy Myers and Doug Radigan were employed in exempt bona fide administrative capacities on

the Projects at issue.  Having so found, IT IS ORDERED THAT judgment is entered in favor of

Defendant, Crawford & Company and against Plaintiffs Wells Hann, Ed Hann, Billy Myers,

Doug Radigan, James Coco and Floyd King (collectively "Plaintiffs") pursuant to Federal Rule

of Civil Procedure 54.  IT IS FURTHER ORDERED that costs are TAXED against Plaintiffs.


This _____ day of _____, 2005.


                                    _____
                                    Donetta W. Ambrose
                                    Chief United States District Judge



cc:    Joseph E. Fieschko, Jr., Esq.
       2230 Koppers Building
       Pittsburgh, PA 15219

       Robert H. Buckler, Esq.
       Robert C. Stevens, Esq.
       Benjamin D. Briggs, Esq.
       Troutman Sanders LLP
       600 Peachtree St. NE
       Suite 5200
       Atlanta, GA 30309

       Richard L. Rosenzweig, Esq.
       Gaca Matis Baum & Rizza
       4 Gateway Center
       444 Liberty Ave., Suite 300
       Pittsburgh, Pennsylvania 15222

Respectfully submitted this 18th day of July, 2005.

/s/Robert C. Stevens
Robert H. Buckler
GA Bar # 092650
Robert C. Stevens
GA Bar # 680142
Benjamin D. Briggs
GA Bar #081902
Troutman Sanders LLP
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308-2216

Shelly R. Pagac
PA. I.D. #63327
LeBoeuf, Lamb, Greene & MacRae L.L.P.
One Gateway Center
Fort Duquesne Boulevard, Suite 1600
Pittsburgh, PA  15222

Richard L. Rosenzweig, Esq.
PA. I.D. # 00953
Gaca, Matis, Baum & Rizza
4 Gateway Center
444 Liberty Avenue, Suite 300
Pittsburgh, PA 15

ATTORNEYS FOR DEFENDANT

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

WELLS HANN, JAMES COCO,          )      CV NO.: 00-1908-DWA
EDWARD HANN, BILLY MYERS,        )
FLOYD KING and DOUG RADIGAN,     )
                                 )      Chief Judge Donetta W. Ambrose
            Plaintiffs,          )
                                 )
      vs.                        )
                                 )
CRAWFORD & COMPANY, a corporation,)
                                 )
            Defendant.           )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

upon counsel of record via first class mail with proper postage affixed thereto, addressed as

follows:

> Joseph E. Fieschko, Jr., Esq.
> Fieschko & Associates, P.C.
> PA I.D. #28797
> 2230 Koppers Building
> Pittsburgh, PA 15219

This 18th day of July, 2005.

> /s/Robert C. Stevens
> Attorney for Defendant
> Crawford & Company