IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WELLS HANN, ELDA COCO,
PERSONAL REPRESENTATIVE
OF THE ESTATE OF JAMES COCO,
deceased, EDWARD HANN, BILLY
MYERS, FLOYD KING and DOUG
RADIGAN,

          Plaintiffs

             vs.

CRAWFORD & COMPANY, a corporation,

          Defendants

CIVIL DIVISION

NO.: 00-1908

Chief Judge Donetta Ambrose
Chief Magistrate Judge Francis X.
Caiazza

PLAINTIFFS' PROPOSED
FINDINGS OF FACT AND
CONSLUSIONS OF LAW

Attorneys of Record for the
Plaintiffs:
Joseph E. Fieschko, Jr., Esquire
Fieschko and Associates
2230 Koppers Building
Pittsburgh, PA  15219
412-281-2204
PA I.D.#28797

John R. Linkosky, Esquire
715 Washington Avenue
Carnegie, PA  15106
412-278-1280
PA I.D.#66011

Tybe A. Brett, Esquire
4710 US Steel Plaza
Pittsburgh, PA  15219
412-288-4387
PA I.D.#30064

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WELLS HANN, ELDA COCO,
PERSONAL REPRESENTATIVE
OF THE ESTATE OF JAMES COCO,
deceased, EDWARD HANN, BILLY          CIVIL ACTION
MYERS, FLOYD KING and DOUG
RADIGAN,                              No.:    00-1908

                    Plaintiffs,       Chief Judge Donetta Ambrose
                                      Chief Magistrate Judge Francis X.Caiazza

vs.

CRAWFORD & COMPANY,
a corporation,

                    Defendants.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Plaintiffs, by and through their undersigned attorneys, file the following proposed

Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

**I.    General**

1.    Plaintiffs Wells Hann ("W Hann"), James Coco ("Coco"), Edward Hann ("EA Hann"),

Billy Myers ("Myers") and Floyd King ("King") commenced their actions for overtime wages on

September 21, 2000.  (Opinion and Order of Court dated May 2, 2005, at 1).

2.    Plaintiff Doug Radigan ("Radigan") commenced his action for overtime wages on

September 26, 2000.  (Opinion and Order of Court dated May 2, 2005, at 1).

II.    **Findings Of Fact Regarding Defendant's Good Faith And Reasonable Grounds For Its Conduct In Failing To Pay Overtime To Plaintiffs.**

3.    The Department of Labor ("DOL") conducted an investigation of Crawford with respect to payment of overtime wages from July 1989 to July 1991, and the report was signed by the investigators on July 19, 1991 and reviewed by their superiors and approved on August 30, 1991. (Tr. 5/16/05 at 221-23; Plaintiffs' Ex. 53 at 34).

4.    The DOL investigation involved the exempt status of sixty-four positions Crawford claimed to be exempt from the overtime provisions of the Fair Labor Standards Act.  The DOL investigators concluded that the exemption was properly claimed for seven of the positions, took no position on eleven of the positions and found Crawford to have improperly claimed an exemption for forty-six of the positions.  (Tr. 5/16/05 at 227-29; Plaintiffs' Ex. 53 at 40-42).

5.    Included in the positions for which Crawford had improperly claimed an exemption were "adjusters" and "CORE Adjusters" who worked as monitors on the Exxon Valdez project and were paid an hourly wage of $26.63 per hour (Tr. 5/16/05 at 227-29; Plaintiffs' Ex. 53 at 40).

6.    A final conference on all positions reviewed was held on June 24, 1991, and was attended by both investigators Pinkstaff and Finkelstein and Crawford's representatives.  The end result of the meeting was that Crawford's representatives refused to come into compliance with the instructions regarding compliance, including keeping records of the employees determined to be nonexempt and paying overtime wages for hours worked in excess of forty per week (Tr. 5/16/05 at 227-29; Plaintiffs' Ex. 53 at 43-44).

7.    Crawford employees who were interviewed by the DOL were instructed by Crawford on what to say to the investigators and Crawford's corporate attorney advised all employees not to

2

sign statements taken by investigators. (Tr. 5/16/05 at 229-30; Plaintiffs' Ex. 53 at 42).

8.    Despite the DOL's findings that numerous employees were not exempt and computation of overtime based on employee interviews Crawford's own records, Crawford refused to agree to future compliance with the FLSA, and as of the date of the DOL report of its investigation, Crawford was not in compliance. (Tr. 5/16/05 at 230-31; Plaintiffs' Ex. 53 at 43-44).

9.    In September of 1993, Crawford instituted a policy where even on catastrophe projects it paid adjusters a $250.00 minimum salary per week. (Knight testimony, Tr. 5/19/05 at 15).

10.    Crawford had no policy prior to September, 1993 to pay adjusters guaranteed minimum salaries, during all time periods for which overtime wages are claimed by the plaintiffs on the Exxon Valdez, Ashland Oil and Buckeye projects.

11.    At a meeting of Crawford CORE adjusters in 1993 in Atlanta, Mike Williams asked Crawford managers whether they were entitled to overtime pay, and Bud Trice, Head of Catastrophe Operations, said that adjusters were not entitled to overtime pay, despite the findings of the 1991 DOL investigation. Beverly Rogers, who worked for Crawford coordinating adjusters, said that Crawford had done some research and came to that conclusion. Gene Renfro asked to see the research, but it was never provided. (Sonnier testimony, Tr.5/16/05 at 75-76).

12.    In a letter dated March 4, 1994, the DOL advised Crawford's general counsel, Judd F. Osten, that the Atlanta Wage and Hour Office had conducted an investigation of Crawford's Atlanta Office which concluded in June 1991, in which it was determined that adjusters are improperly classified as exempt and should receive overtime compensation for hours worked in excess of 40 per week. (Tr. 5/16/05 at 231-33; Plaintiffs' Ex. 53 at 45).

13.    Despite these directives, Crawford did not pay overtime wages to its adjusters and

3

monitors who worked more than 40 hours per week.

### III.    Findings Of Fact Regarding Individual Plaintiff's Right To Overtime

#### A.    Floyd King

14.    At the time of trial, Plaintiff King was 80 years old and had not fully recovered from a stroke about four and a half years earlier. (King testimony, Tr.5/16/05 at 16).

15.    King worked for Defendant Crawford & Company (Crawford) on the Exxon Valdez project in Alaska. (King testimony, Tr.5/16/05 at 16).

16.    As a claims supervisor on the Exxon Valdez project, King took a number of photographs of Crawford's Valdez office, which have remained in his possession since that time. (King testimony, Tr.5/16/05 at 16-18, 24-25; Plaintiffs' Exhibits 68-81).

17.    None of these photographs show an FLSA poster posted in that office, even though these photographs show virtually the entire office, and two of the photographs show the bulletin board in that office during two separate time periods and there is no FLSA poster on that bulletin board. (Plaintiffs' Exhibits 68-81).

18.    King worked as the supervisor at Crawford's Kenai office. He did not put up an FLSA poster in the Kenai office; none was sent by Exxon or Crawford. (King testimony, Tr.5/16/05 at 29, 46, 66, 68).

19.    After working on the Exxon Valdez project, King was sent by Crawford to work on the Buckeye project as a claims adjuster in late 1989. His job was to assign new claims to other adjusters and examine the adjusters' reports when they came back. (King testimony, Tr.5/16/05 at 30, 35).

20.    King maintained a record of his hours worked and turned them into Crawford for

4

payment. (King testimony, Tr. 5/16/05 at 56).

21.     Crawford held back 5% of the amount due to King pending whether the client questioned

payment for certain of the hours charged. (King testimony, Tr. 5/16/05 at 57-58).

22.     If the client paid the entire bill, King received the entire 5%; if the client paid less than

the entire bill, the deficit would be taken from the 5% that had been withheld. (King testimony,

Tr. 5/16/05 at 57-58).

23.     King was paid the same way on the Buckeye and Exxon projects. (King testimony, Tr.

5/16/05 at 62).

24.     King could not recall receiving a payment of $800 for any week in which he did not

work. (King testimony, Tr. 5/16/05 at 63).

25.     King took a number of photographs, showing the entire Buckeye project office during

various time periods and conclusively showing that there was no FLSA poster in that office,

which have remained in his possession since that time. (King testimony, Tr.5/16/05 at 32, 33-34;

Plaintiffs' Exhibits 54-67).

26.     Crawford did not post an FLSA poster in any location where King worked for Crawford,

and King did not see an FLSA poster in any office where he worked for Crawford. (King

testimony, Tr.5/16/05 at 49).

27.     King first saw an FLSA poster in his attorney's office on December 1, 2000. (King

testimony, Tr.5/16/05 at 49).

28.     King did not work on the Ashland Oil project and did not see an FLSA poster in the

Jacobs Building office established for the Ashland Oil project. (King testimony, Tr.5/16/05 at

58, 69-70; Defendant's Ex. L).

29.    By a preponderance of the evidence, and based upon a detailed accounting submitted by King, he was underpaid the following amounts on the following project for the following time periods as a result of Crawford's failure to pay time and one-half for overtime:

Buckeye Oil          04/01/1990-12/21/1991          $14,367.39

(King testimony, Tr.5/16/05 at 36-38; Plaintiffs' Exhibit 86).

**B.    Billy Myers**

30.    Myers worked in Crawford's CORE group from approximately 1990-2000. (Myers testimony, Tr.5/16/05 at 108-09).

31.    Myers was assigned to work by Crawford on the Exxon Valdez project in April 1989, and his first assignment was as an invoice verifier in the office in Valdez, where Floyd King was the supervisor. (Myers testimony, Tr.5/16/05 at 109-11).

32.    Myers remained in the Valdez office for about four months, from April through August 1989). (Myers testimony, Tr.5/16/05 at 112).

33.    Crawford had its own defined space in Valdez, and Myers never had an occasion to go to the second floor of the building, where the Exxon offices were located. (Myers testimony, Tr.5/16/05 at 112).

34.    In Valdez, Myers worked twelve to fourteen hours per day, seven days a week. (Myers testimony, Tr.5/16/05 at 113).

35.    After Valdez, Myers went to Crawford's Anchorage office in August or September 1989. (Myers testimony, Tr.5/16/05 at 113).

36.    Myers remained in the Anchorage office until March or April of 1990. (Myers testimony, Tr.5/16/05 at 114).

6

37.    Myers worked on the same floor as Ed Hann and Bill Tribble. He did not interact very much with the Exxon employees in the Crawford office, who were in a different part of the office, and he only went into the Exxon office perhaps one time. (Myers testimony, Tr.5/16/05 at 115-16, 133-35, 137).

38.    Myers received a payment of $800 from Crawford in a week in which he did not work. (Myers testimony, Tr.5/16/05 at 140).

39.    On the Exxon Valdez project, Myers was not guaranteed an $800 weekly salary or a $250 weekly salary.  He was informed that his basis of pay was an hourly rate.  (Myers testimony, Tr. 5/16/05 at 143-144).

40.    Approximately one month after leaving the Exxon Valdez project, Myers was assigned to the Buckeye project.  (Myers testimony, Tr.5/16/05 at 117).

41.    On both the Exxon Valdez and Buckeye projects, Myers was paid on an hourly basis. (Myers testimony, Tr.5/16/05 at 117).

42.    Myers was paid based on the number of hours he worked and reported on his time sheets, and his pay varied from week to week depending on his hours for both the Exxon Valdez and the Buckeye projects.  Crawford never promised Myers a weekly salary.  (Myers testimony, Tr.5/16/05 at 119-121, 144; Plaintiffs' Exhibit 84).

43.    On the Buckeye Project, Myers was paid at 50% of the amount billed to Buckeye pursuant to time sheets he submitted, subject to a 5% hold back by Crawford.  (Myers testimony, Tr.5/16/05 at 141).

44.    If Buckeye paid Crawford the full amount billed pursuant to Meyer's hours worked and reported, Crawford paid Myers the full amount of the 5%.  If not, Myers was not paid the balance

7

of his wages. (Myers testimony, Tr.5/16/05 at 141).

45.     When Myers was part owner of a company, hourly employees were paid overtime for work over 40 hours per week based on a union contract, but he did not know that as a Crawford adjuster he had a legal right to overtime. (Myers testimony, Tr.5/16/05 at 125-26).

46.     Myers never saw an FLSA notice in any Crawford office. (Myers testimony, Tr.5/16/05 at 113, 116-17, 129-31).

47.     By a preponderance of the evidence, and based upon a detailed accounting submitted by Billy Myers, he was underpaid the following amounts on the following project for the following time periods as a result of Crawford's failure to pay time and one-half for overtime:

| | | |
|---|---|---|
| Exxon Valdez | 04/09/1989-03/10/1990 | $22,520.93 |
| Buckeye Oil | 04/08/1990-01/18/1992 | $11,197.50 |

(Myers testimony, Tr.5/16/05 at 117-121; Plaintiffs' Exhibit 84).

### C.     James Coco

48.     Coco worked with Myers as an invoice reviewer in the Valdez office; there is a picture of Coco in Plaintiffs' Exhibit 73. (Myers testimony, Tr.5/16/05 at 145).

49.     Later, Coco worked out of the office as a monitor. (Myers testimony, Tr.5/16/05 at 146).

50.     By a preponderance of the evidence, and based upon a detailed accounting submitted by Jim Coco, he was underpaid the following amounts on the following project for the following time periods as a result of Crawford's failure to pay time and one-half for overtime:

| | | |
|---|---|---|
| Exxon Valdez | 04/09/1989-08/19/1989 | $13,680.83 |

(Tr.5/17/05 at 60; Plaintiffs' Exhibit 83).

### D.     Edward A. Hann

8

51.       On the Exxon Valdez project, Crawford told EA Hann that he would be paid on an hourly basis with no minimum guaranteed salary. (EA Hann testimony, Tr.5/16/05 at 151-52).

52.   Hann was paid at a rate of 50% of $59.25 per hour on the Exxon Project. He was later raised to a rate of 50% of $79.25 on that project. (EA Hann testimony, Tr. 5/16/05 at 153).

53.   EA Hann worked on the Exxon Valdez project in Anchorage for about thirteen months, from August, 1989 through September 1990, while Jeffrey Archer was there. (EA Hann testimony, Tr.5/16/05 at 152; Archer testimony, Tr.5/16/05 at 253).

54.   EA Hann was paid based on the number of hours worked and reported on his time sheets, his pay varied from week to week depending on his hours recorded and turned in on the Exxon Valdez project, and he never received an extra amount per hour for hours worked in excess of 40 hours per week. (EA Hann testimony, Tr.5/16/05 at 152-155; Plaintiffs' Exhibit 82).

55.   On the Exxon Valdez Project, Hann's pay was calculated at 50% of the hourly rate billed to Exxon. (EA Hann testimony, Tr. 5/16/05 at 178).

56.   Hann was unaware of any 5% hold back on his earnings. (EA Hann testimony, Tr.5/16/05 at 178).

57.   Hann was paid $800 for a week(s) in which he did no work. (EA Hann testimony, Tr.5/16/05 at 178-179).

58.   EA Hann went to the Exxon side of the floor where the Crawford office was located about once a day to get approval on adjustments that had been made and to get Exxon's signatures on reports. He usually spent about 10 or 15 minutes, but he never ate or had coffee in the Exxon office. While on the Exxon side of the building EA Hann observed that there was a

9

room set up on that side of the building to provide food and coffee for the Exxon employees. Exxon employees never came over to the Crawford office to get coffee. (EA Hann testimony, Tr.5/16/05 at 161-63).

59.    EA Hann never saw an FLSA poster when working for Crawford in Alaska. (EA Hann testimony, Tr.5/16/05 at 163).

60.    Although EA Hann acknowledged receipt of employee handbooks from Travelers, where he went to work in 1996, he did not ever read the portions referencing the Fair Labor Standards Act. (EA Hann testimony, Tr.5/16/05 at 180).

61.    In his thirty-eight years working as an adjuster, EA Hann was never paid overtime as an adjuster and he never heard of an adjuster receiving overtime pay. (EA Hann testimony, Tr.5/16/05 at 180-81).

62.    The first time that EA Hann received overtime compensation as an adjuster was in 2002, while working for Travelers. He first received an announcement or email from Travelers in 2002 informing him of Travelers change in policy. He was working out of his home at that time, but he then went down to the office and observed that FLSA posters were posted in the office. (EA Hann testimony, Tr.5/16/05 at 181-183).

63.    At some time in 2001, the property claim representative positions at Travelers were reclassified from exempt to non-exempt. (Carosone testimony, Tr. 5/19/05, at 65).

64.    By a preponderance of the evidence, and based upon a detailed accounting submitted by EA Hann, he was underpaid the following amounts on the following project for the following time periods as a result of Crawford's failure to pay time and one-half for overtime:

Exxon Valdez        08/06/1989-09/29/1989        $27,794.70

(EA Hann testimony, Tr.5/16/05 at 152-153; Plaintiffs' Exhibit 82).

     **E.**    **Wells Hann**

65.    W Hann began to work for Crawford on the Ashland Oil project in Pittsburgh in September 1989 and continued until late spring 1991.  (W Hann testimony, Tr.5/16/05 at 186-87).

66.    On the Ashland Oil project, W Hann worked out of an office in the Jacobs Building in Greentree and worked at a small office space off of Route 51 near Brownsville Road.  (W Hann testimony, Tr.5/16/05 at 187).

67.    W Hann's first supervisor on the Ashland Oil project was John Knight; after about a month, Kip Radigan became his boss for the remainder of his time on the project.  (W Hann testimony, Tr.5/16/05 at 188).

68.    W Hann was paid hourly on the project.  (W Hann testimony, Tr.5/16/05 at 186-87).

69.    W Hann almost always worked over 40 hours per week on the Ashland Oil project.  (W Hann testimony, Tr.5/16/05 at 188).

70.    On the Ashland Oil project, W Hann filled out his hours on a weekly basis and his compensation was based upon the number of hours worked per week, and his pay varied in accordance with the hours reported; if he worked over 40 hours per week, he did not receive one and a half times his normal rate.  (W Hann testimony, Tr.5/16/05 at 189; Plaintiffs' Exhibit 85).

71.    W Hann was promised no minimum salary for any work week.  (W Hann testimony. Tr. 5/16/05 at 188-89).

72.    Hann's pay on the Ashland Project was subject to a 5% hold back pending whether Ashland paid the bill for the hours he submitted in full; if Ashland did pay the bill, Hann would

receive the balance of his wages. (W Hann testimony. Tr. 5/16/05 at 202).

73.    W Hann did not see an FLSA notice in the Jacobs Building office. (W Hann testimony, Tr.5/16/05 at 189).

74.    No evidence was presented that an FLSA notice was posted in Crawford's office on Route 51, where W Hann worked.

75.    Subsequent to the Ashland Oil project, W Hann set up an office in Tallahassee. Crawford never sent an FLSA poster to W Hann to put up in the Tallahassee office. (W Hann testimony, Tr.5/16/05 at 191-93).

76.    W Hann was never paid overtime wages for any hours over 40 worked per week as an adjuster, even though he almost always worked over 40 hours per week. (W Hann testimony, Tr.5/16/05 at 208-09).

77.    By a preponderance of the evidence, and based upon a detailed accounting submitted by Wells Hann, he was underpaid the following amounts on the following project for the following time periods as a result of Crawford's failure to pay time and one-half for overtime:

Ashland Oil          09/03/1989-03/23/1991        $4,550.27

(W Hann testimony, Tr.5/16/05 at 188-190; Plaintiffs' Exhibit 85).

**F.    Douglas Radigan**

78.    Plaintiff Radigan worked on the Exxon Valdez project for Crawford from May, 1989, through September 23, 1989. (Radigan testimony, Tr.5/17/05 at 4-5).

79.    Radigan worked as a monitor, and Kermith Sonnier was Radigan's supervisor in Alaska. (Radigan testimony, Tr.5/17/05 at 5).

80.    Initially, Radigan reported to the Valdez office and was sent to sites located in Valdez to

check inventory and personnel. (Radigan testimony, Tr.5/17/05 at 5).

81.    Later, Radigan lived on the EB-2 and worked from there. Radigan slept on the EB-2 and went to different work sites on a small boat. (Radigan testimony, Tr.5/17/05 at 5-7).

82.    Initially, Radigan worked from about 5:00 in the morning until about eight or nine o'clock at night, and then less hours later. (Radigan testimony, Tr.5/17/05 at 6-8).

83.    Radigan kept accurate time records of the hours he worked on the Exxon Valdez project. (Radigan testimony, Tr.5/17/05 at 8-9; Plaintiffs' Exhibit 87).

84.    Radigan was paid an hourly rate on the Exxon Valdez project, his pay was based on the hours recorded on his time sheets, and he did not receive a rate that was one and a half times his normal rate for any hour worked over 40 hours per week. (Radigan testimony, Tr. 5/17/05 at 10-11; Plaintiffs' Exhibit 87).

85.    Radigan's pay varied from week to week in accordance with the hours he reported. (Radigan testimony, Tr. 5/17/05 at 10-11).

86.    Radigan was not guaranteed any minimum salary for any week in which he worked. (Radigan testimony, Tr. 5/17/05 at 10-11).

87.    On the Exxon Valdez Project, Radigan's compensation was calculated at 50% of the amount charged by Crawford for the hours he worked and reported, subject to a 5% hold back. (Radigan testimony, Tr. 5/17/05 at 26).

88.    If Exxon paid the entire bill, Radigan would get the 5% in its entirety, if Exxon found problems with the bill, the amount in dispute would be taken from the 5% that had been withheld. (Radigan testimony, Tr. 5/17/05 at 26).

89.    On the Exxon Valdez Project, Radigan received a payment of $800 for a week in which

he did no work.  (Radigan testimony, Tr. 5/17/05 at 27).

90.     While working in Valdez, Radigan occasionally went into the office, where Bill Tribble and Floyd King worked, to turn his reports into Kermith Sonnier.  (Radigan testimony, Tr.5/17/05 at 18, 23-24).

91.     Radigan did not see any Fair Labor Standards Act posters in Alaska.  (Radigan testimony, Tr.5/17/05 at 18-19).

92.     After Radigan left Alaska in September, 1989, he began to work on the Uni-Mart project, on which he was paid hourly and was never promised a guaranteed minimum salary on the project. (Radigan testimony, Tr.5/17/05 at 11-12).

93.     However, there is no evidence that Radigan worked more than 40 hours per week on the Uni-Mart project, and he has no claim to overtime wages for work on that project.

94.     There was no FLSA poster in the office on the Uni-Mart project, from which Radigan picked up and dropped off his claims. (Radigan testimony, Tr.5/17/05 at 13-15, 19; Hitson testimony, Tr. 5/19/05 at 74-75).

95.     Radigan did not work with Charlie Hitson on the Uni-Mart project.  Hitson worked in another building in Penn West Center, where the branch office was located.  (Radigan testimony, Tr.5/17/05 at 28, 32).

96.     Radigan did not go over to visit John Knight while working on the Uni-Mart project; John Knight came to see Radigan at the office where he was working on the Uni-Mart project. (Radigan testimony, Tr.5/17/05 at 29).

97.     After the Uni-Mart project, Radigan went directly to the Buckeye project.  (Radigan testimony, Tr.5/17/05 at 13, 15-16).

98.    Radigan was paid hourly on the Buckeye project. (Radigan testimony, Tr.5/17/05 at 16).

99.    Radigan worked over 40 hours per week on Buckeye, but he was not paid one and a half times his normal rate for hours worked in excess of 40. (Radigan testimony, Tr.5/17/05 at 16).

100.    Radigan was not guaranteed a minimum salary on the Buckeye project. (Radigan testimony, Tr.5/17/05 at 16).

101.    Radigan remained on the Buckeye project for about two years, working more hours in the beginning of the project and fewer hours towards the end. (Radigan testimony, Tr.5/17/05 at 16).

102.    On Buckeye, Radigan initially worked in the field as a monitor. Later, he did invoice file review in the office. (Radigan testimony, Tr.5/17/05 at 16-17).

103.    Radigan has worked as an adjuster since 1989, but he was never paid overtime wages working as an adjuster or a monitor and he never heard of adjusters being paid overtime for hours worked over 40. (Radigan testimony, Tr.5/17/05 at 37).

104.    Radigan learned about the instant law suit from W Hann in 1999 or 2000, and that was the first time he suspected there may be a right to overtime for adjusters. (Radigan testimony, Tr.5/17/05 at 37).

105.    By a preponderance of the evidence, and based upon a detailed accounting submitted by Doug Radigan, he was underpaid the following amounts on the following project for the following time periods as a result of Crawford's failure to pay time and one-half for overtime:

|  |  |  |
|---|---|---|
| Exxon Valdez | 05/07/1989-09/23/1989 | $11,879.63 |
| Buckeye Oil | 09/24/1989-12/21/1991 | $6,516.25 |

(Radigan testimony, Tr.5/17/05 at 8-10; Plaintiffs' Exhibit 87).

## IV.    Findings of Fact Regarding Whether Defendant Posted FLSA Notices At The Work Sites At Issue in This Case

106.    In general, it was Crawford's policy not to post FLSA notices in its temporary catastrophe

offices. (Knight testimony, Tr. 5/19/05 at 21, 24).

107.    By May 10, 1990, Crawford knew of its obligation to post FLSA notices and had a policy

to post the notices in its branch offices. (Hitson testimony, Tr. 5/19/05 at 69, 71-72; Defendant's

Exhibit W; Knight testimony, Tr. 5/19/05 at 20-21).

108.    Despite its knowledge of its legal obligation, Crawford did not post FLSA notices in its

temporary facilities opened for catastrophe operations. (Knight testimony, Tr. 5/19/05 at 21, 24).

109.    Despite its knowledge of its legal obligation, Crawford did not post notices on the Exxon

Valdez project or the Buckeye Project. (Stipulation, Tr. 5/20/05, at 5; King testimony,

Tr.5/16/05 at 34; Plaintiffs' Exhibits 54-67).

### A.    Findings of Fact Regarding Whether Defendant Posted FLSA Notices At Its Work Sites On The Exxon Valdez Project

110.    There were no FLSA posters in any of the areas where Kermith Sonnier worked on the

Exxon Valdez project, and Crawford did not post FLSA notices anywhere in Alaska. (Opinion

and Order of Court dated May 9, 2005, at 7-8; Tr. 5/20/05 at 3, 5, 7).

111.    During the Exxon Valdez project, Crawford did not have an exacting audit procedure in

which precise records set forth that the FLSA notice was posted in each office where Crawford

employees worked. (Knight testimony, Tr. 5/19/05 at 15-16).

112.    Kermith Sonnier, the plaintiff in Sonnier v. Crawford & Company, CA: 94-1755

(W.D.Pa. 1997), aff'd, No. 97-3096, 1997 U.S. App. LEXIS 33444 (3d Cir. 1997), cert. denied,

523 U.S. 1107 (1998), was in charge of the monitors on the Exxon Valdez project; he worked out

of an office on the first floor of a building in Valdez, he went out to the EB-2, and he went into

the Anchorage office in the Calais Building,  (Sonnier testimony, Tr.5/16/05 at 79-81, 83).

113.   Crawford's corporate policy concerning placement of FLSA notices on employee bulletin

boards only required the placement of the notices in permanent offices and explicitly excluded

the placement of the notices on bulletin boards in temporary facilities opened for catastrophe

operations. (Knight testimony, Tr. 5/19/05 at 16, line 13 to 23, line 4).

114.   At the end of trial, Crawford stipulated that it did not post FLSA notices anywhere in

Alaska on the Exxon Valdez project.  (Tr. 5/20/05 at 3, 5, 7).

### 1.   Valdez Office

115.   While Kermith Sonnier and Floyd King were in the Valdez office, the Crawford people

worked on the first floor in an enclosed area in one big room, with two doors to the outside, and

only one bulletin board.  All of the employees in that office were Crawford people, except for

one Exxon person, either Dick Green or Dick Dow.  Later, some Arthur Anderson people, who

worked under the supervision of King, were brought in.  (Sonnier testimony, Tr.5/16/05 at 84-94;

Plaintiffs Exhibits 68-78; Robinson testimony, Tr. 5/17/05 at 51-52; King testimony, Tr.5/16/05

at 20-21; Myers testimony, Tr.5/16/05 at 111).

116.   Crawford personnel were not interspersed throughout the entire building but "were

confined to one large room on the bottom floor."  (Knight testimony, Tr. 5/19/05 at 11).

117.   The Crawford employees in the Valdez office were not permitted to go into the Exxon

office on the second floor unless specifically invited or unless they had particular business; they

"were on per diem," and they did not eat in the Exxon offices on the second floor of the building

in Valdez. (Sonnier testimony, Tr.5/16/05 at 94-95; Tribble testimony, Tr. 5/19/05 at 138-41).

118.   There were no FLSA posters in Crawford's Valdez office.  (Sonnier testimony,

Tr.5/16/05 at 97; Tribble testimony, Tr. 5/19/05, at 139; King testimony, Tr.5/16/05 at 24, 46; Myers testimony, Tr.5/16/05 at 110, 113, 117; Plaintiffs' Exhibits 68-81).

119.    The only evidence of FLSA notices in the Valdez Command Center was that they were posted in Exxon's main office on the second floor, on a bulletin board adjacent to where the meals were served and in a coffee room down the hall. There is no evidence that they were posted in the first floor office where Crawford employees worked.  (Carpenter testimony, Tr. 5/17/05 at 237-38; Tr. 5/19/05 at 38-39; Myers testimony, Tr.5/16/05 at 111-12; Tribble testimony, Tr. 5/19/05 at 138-139).

120.    Crawford's supervisors' testimony that there were no FLSA notices in these offices was confirmed by the testimony of Crawford's and Exxon's employees (Myers testimony, Tr.5/16/05 at 110-113, 117; EA Hann testimony, Tr.5/16/05 at 162-63; Radigan testimony, Tr.5/17/05 at 18-19; Cunningham testimony, Tr.5/16/05 at 238; Archer testimony, Tr.5/16/05 at 255-56; Wilson testimony, Tr. 5/17/05 at 47-49; Graves testimony, Tr. 5/20/05 at 10; Carpenter testimony, Tr. 5/17/05 at 240-41; Tr. 5/19/05 at 41-42).

121.    Adjusters in Valdez were expected by Crawford to work every day, seven days a week, twelve to fourteen hours per day, and were paid by the hour.  There was no weekly minimum. (Robinson testimony, Tr. 5/17/05 at 50-51).

122.    Otto Harrison was the general manager for Exxon on the project and retired as the president of Exxon Pipeline. (Harrison testimony, Tr. 5/17/05 at 251).

123.    Harrison could not remember either of Crawford's project managers, Tribble and Little, despite the fact that he claims to have eaten all meals with them on a daily basis. (Harrison testimony, Tr. 5/19/05 43-44).

18

124.    There was ongoing litigation between Exxon and the tender boat operators through at last

2003. (EA Hann testimony, Tr.5/16/05 at 156-167).

125.    The only evidence that Exxon posted FLSA notices in the Crawford office in Valdez was

vague testimony by Otto Harrison (Harrison testimony, Tr. 5/17/05 at 260, lines 8-10).

### 2.    Anchorage Office

126.    Crawford's office in Anchorage was located in a multi-story building; Crawford's office

was in a distinct area, with its own defined space, with one or two partitioned walls, on the third

or fourth floor of the building, and with separate entrances from the Exxon section. The

Crawford office was located on the left of the elevator. From the elevator, the Crawford

employees could not go into the Exxon side of the floor because there was a guard there "that

wouldn't let you in." Exxon occupied an office on the same floor as the Crawford office, as well

as offices on other floors, but Crawford employees were strictly forbidden from even opening the

door to the Exxon office; Bill Tribble told the employees that they were forbidden from going

into the Exxon parts of the building. (EA Hann testimony, Tr.5/16/05 at 158-59, 160-62;

Cunningham testimony, Tr.5/16/05 at 237, 241; Archer testimony, Tr.5/16/05 at 251-52; Wilson

testimony, Tr. 5/17/05 at 47; Myers testimony, Tr.5/16/05 at 113-16).

127.    Crawford had its own office in Anchorage and it was not intermingled with an Exxon

office; the Crawford office was separate from the Exxon office. (Archer testimony, Tr.5/16/05 at

251-255; Tribble testimony, Tr. 5/19/05 at 142-43; Myers testimony, Tr. 5/16/05 at 115, 133-35).

128.    There were approximately fifteen to twenty people, all of whom worked for Crawford

except for two Exxon people, Dick Green and Doug Dow, who would alternate, in Crawford's

Anchorage office in the Calais Building on the Exxon Valdez project from September 1989 to

19

February 1991. (Cunningham testimony, Tr.5/16/05 at 235-37, 243; Archer testimony, Tr.5/16/05 at 251-53; Wilson testimony, Tr. 5/17/05 at 43-44; EA Hann testimony, Tr. 5/16/05 at 158-60).

129.    The Crawford employees did not interact very much with the Exxon employees in the Crawford office; the Exxon people did not use Crawford's break room or copy room in the Anchorage office. (Myers testimony, Tr.5/16/05 at 133-35; Cunningham testimony, Tr.5/16/05 at 238, 242; Archer testimony, Tr.5/16/05 at 257-58).

130.    There was no FLSA poster in any part of  Crawford's Anchorage office in the Calais Building on the Exxon Valdez project, including the room where the copy machine was located and the break room where the coffee pot, a water cooler and some vending machines were located near the entrance to the Crawford office. (Cunningham testimony, Tr.5/16/05 at 238; Archer testimony, Tr.5/16/05 at 255-56; Wilson testimony, Tr. 5/17/05 at 47-49; Tribble testimony, Tr. 5/19/05 at 143-44; Graves testimony, Tr. 5/20/05 at 10; EA Hann testimony, Tr.5/16/05 at 162-63; Carpenter testimony, Tr. 5/17/05 at 240-41; Tr. 5/19/05 at 41-42).

131.    Crawford's office in the Calais Building in Anchorage was on the north side of the building, from which there was a beautiful view of Mt. McKinley.  (Cunningham testimony, Tr.5/16/05 at 239).

132.    Carpenter testified his office was next to Harrison's.  Carpenter's and Harrison's offices were located on the Fourth Floor of the Calais Building, and there was an FLSA posting on that floor because it was a permanent Exxon office that was already occupied by Exxon. He didn't know if there was an FLSA posting on the Third floor where Crawford was located. (Carpenter testimony, Tr. 5/17/05 239-240 and 5/19/05 39-42).  Crawford was located on the Third Floor in

a space which had been an empty space in the building and the space was specifically set up for

Crawford's operations (Tribble testimony, Tr. 5/19/05 142, lines 12-13 and 146 lines 5-7.

133.  Harrison testified that his office was either on the fourth or third floor, that the floor was

not devoted solely to Exxon Valdez operations, and that there were Crawford employees on his

floor for part of the time he worked there.  He testified that there was an FLSA poster in a storage

room near the elevator bank in his office.  He was unable to place an FLSA notice in Crawford's

office in the Calais Building, and he did not testify whether the FLSA notice that he saw was in

the third floor or the fourth floor. (Harrison testimony, Tr. 5/17/05 265-270).

### B.    Findings Of Fact Regarding Whether Defendant Posted FLSA Notices On The Ashland Oil Project

134.    During the Ashland Oil project, Crawford did not have an exacting audit procedure in

which precise records set forth that the FLSA notice was posted in each office where Crawford

employees worked.  (Knight testimony, Tr. 5/19/05 at 15-16).

135.    While there is evidence that John Knight posted an FLSA notice in the Ashland Oil

project office in the Jacobs Building prior to November 17, 1988, there was no evidence that the

notice was replaced when a new notice was published in 1990 when the minimum wage

increased and after Knight had left the project Kip Radigan took over supervision of the Ashland

Oil project. (Harmon testimony, Tr. 5/17/05 at 102-104; Defendants' Exhibits L-1 - L-23; Knight

testimony, Tr. 5/17/05, at 156).  Crawford's Ashland office was set up by Phil Harmon, who was

not a Crawford employee and was occupied by him (Harmon testimony, Tr. 5/17/05 at 99-102).

136.    On the Ashland Oil project, Kermith Sonnier also worked out of an office in Whitehall on

Route 51.  (Sonnier testimony, Tr.5/16/05 at 78-79).

137.    No FLSA notice was posted in the Whitehall office.  (W Hann testimony, Tr.5/16/05 at

190).

### C.    Findings Of Fact Regarding Whether Defendant Posted FLSA Notices On The Buckeye Project

138.    There is no evidence that during the Buckeye project, Crawford had an exacting audit procedure in which precise records set forth that the FLSA notice was posted in each office where Crawford employees worked.  (Knight testimony, Tr. 5/19/05 at 15-16).

139.    A separate, one room office for the Buckeye project was set up in Natrona Heights. (King testimony, Tr.5/16/05 at 31-32).

140.    Crawford's Buckeye project office in Natrona Heights is accurately portrayed in Plaintiffs' Exhibits 54-67.  (Sonnier testimony, Tr.5/16/05 at 96-97; Myers testimony, Tr. 5/16/05 at 117; King testimony, Tr.5/16/05 at 32, 33-34; Plaintiffs' Exhibits 54-67; Radigan testimony, Tr.5/17/05 at 17).

141.    There was no FLSA poster in the Buckeye project office in Natrona Heights; neither Buckeye Oil nor Crawford sent an FLSA poster to put up in the Buckeye project office.  (King testimony, Tr.5/16/05 at 34; Sonnier testimony, Tr.5/16/05 at 96-97; Plaintiffs' Exhibits 54-67; Radigan testimony, Tr.5/17/05 at 19).

## CONCLUSIONS OF LAW

### I.    General

1.    Under the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1), Crawford had a duty to pay to Plaintiffs working on an hourly basis on the Exxon Valdez, Ashland Oil and Buckeye Projects, compensation at a rate of not less than one and one-half times their regular rate for working more than forty hours per week.

2.    Plaintiffs' actions for overtime wages for work in excess of forty hours per week arise

from Crawford's failure to pay overtime wages under the Fair Labor Standards Act ("FLSA"), 29

U.S.C. § 207(a)(1) and 29 U.S.C. § 216(b).

3.       This Court has jurisdiction under 28 U.S.C. § 1331.

**II.     <u>Crawford Failed To Meet Its Burden Of Showing Plaintiffs Were Exempt From The
Requirements Of The FLSA.</u>**

4.       Crawford claims Plaintiffs to be exempt of the requirements of the FLSA pursuant to 29

U.S.C. § 213(a)(1) as defined in 29 CFR § 541 et seq.

5.       The application of an exemption under the FLSA is an affirmative defense on which the

employer has the burden of proof.  <u>Corning Glass Works v. Brennan,</u> 417 U.S. 188, 196, 197

(1974); <u>Arnold v. Ben Kanowsky, Inc.,</u> 361 U.S. 388, 392 (1960).

6.       Exemptions from the provisions of the FLSA which are claimed by an employer are to be

narrowly construed.  <u>Arnold v. Ben Kanowsky, Inc.,</u> 361 U.S. 388, 392 (1960).

7.       It is the employer's burden to prove that its employees come within any overtime

exemption claimed and any exemption from the FLSA must be proven plainly and unmistakably.

<u>Freidrich v.U.S. Computer Service,</u> 974 F.2d 409 (3d Cir. 1992) (citing <u>Martin v. Cooper</u>

<u>Electric Supply Co.,</u> 940 F.2d 896 (3d Cir. 1991)).

8.       The employer, "must overcome the presumption that the ... exemption does not apply to

its employees." <u>Martin v. Malcolm Pirnie, Inc.,</u> 949 F.2d 611 (2d Cir. 1991), <u>cert.</u> <u>denied,</u> 506

U.S. 905 (1992).  The burden of proving the exemption is on the employer and if the record is

unclear as to some exemption requirement, the employer will be held not to have satisfied its

burden.  <u>Idaho Sheet Metal Works, Inc., v. Wirtz,</u> 383 U.S. 190, 206 (1966).

9.       In order to qualify for exemption under 29 U.S.C. § 213(a)(1), an employer must meet all

the tests outlined in 29 CFR § 541, et seq.  <u>Walling v. General Industries, Co.,</u> 330 U.S. 545, 547,

548 (1947); <u>Rau v. Darling's Drug Store, Inc.</u>, 338 F.Supp. 877, 881 (W.D. Pa. 1975).

10.    These tests include the requirement that the employed is compensated for his services on a salary basis. 29 C.F.R. §§ 541.2(e)(1), 541.1(f).

11.    In order to satisfy the salary basis test under 29 U.S.C. § 213(a)(1), 29 C.F.R. § 541 <u>et seq.</u>, an employee must regularly receive each pay period on a weekly, or less frequent basis, a predetermined amount consisting of all or part of his compensation, which amount is not subject to reduction because of variations in the quantity or quality of the work performed.  29 CFR §§ 541.1, 541.2(e)(1), 541.118.

12.    This test is not satisfied because, Plaintiffs were not paid a predetermined amount constituting all or part of their compensation and the amounts paid were subject to reduction because of the variations in the quantity (hours) of work performed.  Findings of Fact 43, 56, 72 and 87

13.    An employer who maintains the discretion to reduce an employee's compensation as the result of the employee's hours of work or the quality of the employer's work, may not consider the employee to be paid on a salaried basis.  <u>Martin v. Malcolm Pirnie, Inc.</u>, 949F.2d 611 (2d Cir. 1991), <u>cert.</u> <u>denied</u>, 506 U.S. 905 (1992); <u>Carpenter v. The City and County of Denver</u>, 82 F.3d 353, 359 (10th Cir. 1996); <u>Bankston v. State of Illinois</u>, 68 F.3d 1249, 1253 (7th Cir. 1995); <u>Kennedy v. District of Columbia</u>, 994 F.2d 6, 11 (D.C. Cir. 1993).

14.    Crawford retained a 5% "hold back" from the weekly compensation calculated for Plaintiffs on condition as to whether Crawford's client paid for the amount of hours claimed by each individual Plaintiff.  Findings of Fact 43, 56, 72 and 87.

15.    If the client paid the full amount, the Plaintiff was reimbursed the full 5%.  If the client

contested the amount, the Plaintiff was paid the 5% less the contested amount.

16.    Plaintiffs' compensation was subject to reduction based on the quality of their work

17.    Crawford's withholding of 5% of Plaintiffs' weekly pay defeats Crawford's claim of exemption pursuant to § 213(a)(1).

18.    An employee will not be regarded as exempt pursuant to § 213(a)(1) of the FLSA if he is covered by a policy that permits disciplinary or other deductions in pay as a practical matter. That standard is met if there is either an actual practice of making such deductions or an Employment Policy that creates a "significant likelihood of such deductions." Auer v. Robbins, 519 U.S. 452 (1997).

19.    Crawford's policy and practice regarding the 5% "holdback" resulted both in actual deductions and a "significant likelihood of such deductions."

20.    The FLSA requires overtime payment at one and one-half times an employee's regular rate of pay for hours worked in excess of forty in any work week.  29 U.S.C. § 207(a).

21.    The practice by Crawford of paying $800 to Plaintiffs in weeks in which they performed no work does not constitute payment for hours worked in the work week and is of no consequence in determining the applicability of an exemption pursuant to § 213 (a)(1) of the Act. Findings of Fact 24,38,39,57, and 89.

### III.    Crawford's Violations Of The FLSA Were Not In Good Faith And Crawford Did Not Have Reasonable Grounds For Its Conduct, Thus Entitling Plaintiffs To Liquidated Damages.

22.    An employer who violates the FLSA "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, and in an additional equal amount as liquidated damages.  29 U.S.C. § 216(b).

23.    An award of liquidated damages is mandatory unless the employer carries its burden demonstrating good faith and reasonable grounds for its conduct. Martin v. Selker Bros., Inc., 949 F.2d 1286, 1299 (3d Cir. 1991). See also Brock v. Claridge Hotel & Casino, 846 F.2d 180, 187 (3d Cir.), cert. denied, 488 U.S. 295 (1988); Marshall v. Brunner, 668 F.2d 748, 753 (3d Cir. 1988).

24.    Liquidated damages are compensatory rather than punitive in nature, in that they compensate the employee for losses he may have suffered by reason of not receiving proper wages when they were due. Overnight Motor Transp. v. Missel, 316 U.S. 572, 583 (1942); Martin, 949 F.2d at 1298.

25.    To satisfy the good faith requirement, the employer must show an honest intention to ascertain and follow the dictates of the FLSA. Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 465 (D.C. Cir. 1976), cert denied, 434 U.S. 1086 (1978).

26.    The reasonable grounds test is an objective one, and is not satisfied by ignorance. Brunner, 668 F.2d at 753.

27.    If the employer fails to come forward with substantial evidence to satisfy the good faith and reasonable grounds requirements, the Court is without discretion to deny liquidated damages. Selker Bros., 949 F.2d at 1296; Willians v. Tri-County Growers, Inc., 141 F.2d 121, 129 (3d. Cir. 1984); Claridge Hotel & Casino, 846 F.2d at 187; Walton v. United Consumer's Club, Inc., 786 F.2d 303, 310 (7th Cir. 1986)..

28.    To carry his burden, the employer must show that it took affirmative steps to ascertain the actual requirements of the FLSA, but nonetheless violated its provisions. The employee need not establish an intentional violation of the FLSA to recover liquidated damages. Martin v. Cooper

Electric Supply Co., 940 F.2d 896 (3d Cir. 1991) (citing Tri-County Growers, Inc., 141 F.2d at 129.

29.    An employer acts willfully where it had reason to know that its conduct was prohibited by the FLSA on the basis of prior DOL investigations. Dole v. Solid Waste Systems, Inc., 733 F. Supp. 895 (E.D. Pa. 1989), aff'd, 897 F.2d 521 (3d Cir. 1990), cert. denied, 497 U.S. 1024 (1990).

30.    As set forth in Findings of Fact 6 above, Crawford knew that Plaintiffs' positions were not exempt from the overtime laws at least as early as June 24, 1991, and Crawford knowingly misrepresented the factual basis for this knowledge to their employees and knowingly failed to pay overtime compensation as the FLSA requires. There is no evidence in the record that Crawford acted in good faith and with reasonable grounds, and Plaintiffs are entitled to liquidated damages.

## IV.    The Statute Of Limitations Does Not Bar Plaintiffs' Actions For Overtime Compensation Under The FLSA.

31.    The relevant statute of limitations is set forth at 29 U.S.C. § 255(a), which provides that an action for unpaid overtime compensation under the FLSA must be "commenced within two years after the cause of action accrued . . ., except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."

### A.    The Two-Year Statute of Limitations Is Equitably Tolled For Each Plaintiff Until That Plaintiff Gained Actual Knowledge Of His Legal Right To Overtime For Work Performed For Crawford.

32.    "The equitable tolling doctrine 'is read into every federal statute of limitations.'" Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946). See also Prudential Ins. Co. of Am v. U.S.

Gypsum Co., 359 F.3d 226, 237-38 (3d Cir. 2004); Forbes v. Eagleson, 228 F.3d 471, 486 (3d Cir. 2000); State Farm Mut. Auto Ins. Co. v. Red Lion Med. Ctr., Inc., 2001 U.S. Dist. LEXIS 24101 (E.D. Pa. 2001); In re Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355 (D.N.J. 2001).

33.    Equitable tolling is appropriate "'where the employer's own acts or omissions have lulled the plaintiff into foregoing prompt attempts to vindicate his rights.'" Henchy v. City of Absecon, 148 F.Supp.2d 435, 438-39 (D.N.J. 2001)(quoting Meyer v. Rygiel Prod. Corp., 720 F. 2d 303, 309 (3d Cir. 1983).

34.    Under the FLSA, the employer has a duty to post a notice informing its employees of their rights under the minimum wage and overtime provisions of the statute:

> Posting of notices.
>
> Every employer employing any employees subject to the Act's minimum wage provisions shall post and keep posted a notice explaining the Act, as prescribed by the Wage and Hour Division in conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy.

29 C.F.R. § 516.4.

35.    If an employer fails to comply with 29 C.F.R. §516.4, its employees' claims for damages under the minimum wage or overtime provisions of the FLSA are tolled until the employee seeks an attorney and becomes aware of his legal right to pursue a claim for overtime wages.

36.    There is a two-part test concerning cases in which an employer fails to post appropriate FLSA notices or ADEA notices; once the employee presents evidence that the employer failed to comply with 29 C.F.R. § 516.4, the burden shifts to the employer to show that the employee had actual knowledge of his right to overtime or sought an attorney at some time outside of the applicable statute of limitations. Bonham v. Dresser Industries Inc., 569 F.2d 187, 193 (3rd Cir.

1977), cert. denied, 439 U.S. 821 (1978), Kamens v. Summit Stainless Inc., 586 F. Supp. 324

(E.D.Pa. 1984), Nogar v. Henry F. Teichmann, Inc., 640 F.Supp. 365, 370 (W.D.Pa.1985),

Callowhill v. Allen-Sherman-Hoff Company, Inc., 832 F.2d 269 (3rd Cir. 1987), and Sonnier v.

Crawford & Company, CA: 94-1755 (W.D.Pa.), aff'd, No. 97 3096, 1997 U.S. App. LEXIS

33444 (3d Cir. 1997), cert. denied, 523 U.S. 1107 (1998).

### 1.   Crawford Failed To Meet Its Burden Of Showing That It Posted An FLSA Notice As Required By 29 C.F.R. § 516.4 At The Worksites Where Plaintiff Worked For Crawford.

37.    Crawford has the burden to prove that the notice was posted, given the exacting audit

procedures an employer must follow to keep records that notice has been posted.   Sonnier v.

Crawford & Co., CA No. 94-1755 (W.D. Pa. 1997) (conclusions of law 2-6), aff'd., No. 97-3096,

1997 U.S. App. LEXIS 33444 (3d Cir. 1997), cert. denied, 523 U.S. 1107 (1998).

38.    As set forth in Findings of Fact 111, Crawford failed to produce any written records of

the audits required to monitor the posting of FLSA notices at any of the catastrophe offices, and

failed to meet its burden that notice was posted in any of the offices at issue in this case.

39.    As set forth in Findings of Fact 107 and 108 above, at all relevant times Crawford was

aware of the posting requirement of 29 C.F.R. § 516.4, and it knew that its failure to post FLSA

notices on its catastrophe projects, including the Exxon Valdez project and Buckeye projects,

violated the FLSA, further supporting equitable tolling in this case.

### 2.   Crawford's Burden Of Demonstrating That It Posted FLSA Notices On The Exxon Valdez Project Is Not Met By Posting Of Notices By Exxon

40.    Crawford's duty to post FLSA notices in the temporary offices where Plaintiffs worked

on the Exxon Valdez project is not met by the posting of notices by Exxon and Veco at their

29

work sites.  Sonnier v. Crawford & Co., CA No. 94-1755 (W.D. Pa. 1997) (Conclusions of Law

1), aff'd., No. 97-3096, 1997 U.S. App. LEXIS 33444 (3d Cir. 1997), cert. denied, 523 U.S. 1107

(1998) (attached hereto as Exhibit I); Memorandum Order in Moss v. Crawford & Co., C.A. No.

98-1350 (W.D. Pa.), dated June 13, 2003 (attached hereto as Exhibit II).

41.    DOL Wage and Hour Op. Ltr. (March 3, 2003) does not permit Crawford to meet its

burden of demonstrating that another employer posted the notices because:

        (a)    The opinion letter assumes that the employees of one employer were
working in another employer's office, where the notice was posted, while the evidence is
uncontradicted that: Crawford set up its own temporary offices on the Exxon Valdez
project and the Crawford employees responsible for setting up these temporary offices
were never provided FLSA notices; and Crawford's adjusters had very little contact with
Exxon and Veco employees and generally were not permitted access to Exxon or Veco
offices.

        (b)    Any notices posted by Exxon or Veco was not "conspicuous," as required
by the opinion letter, in that there is no evidence that any Plaintiff saw such notices on the
Exxon Valdez project.

        (c)    In order to use DOL Wage and Hour Op. Ltr. (March 3, 2003) to excuse its
failure to post the notices required by the regulation, Crawford must show that they acted
in good faith, in conformity with and in reliance upon that letter.  The conduct in question
here occurred from 1989 through 1992, over 10 years prior to DOL Wage and Hour Op.
Ltr. (March 3, 2003), and Crawford could not have relied in good faith upon a letter
issued after the conduct in question; the reliance is not retroactive.  29 C.F.R. § 790.1;
Donovan v. Baskin & Robbins 527 F. Supp. 93 (D.C.N.M. 1983); Olson v. Superior
Pontiac, 765 F. 2d 1570 (11th Cir. 1985);

        (d)    The "good faith" defense in a wage and hour case requires that the opinion
letter be signed by the administrator of the Wage and Hour Division of the United States
Department of Labor, but DOL Wage and Hour Op. Ltr. (March 3, 2003) is signed by a
team leader with no authority under § 259(b) to sign a letter used as a good faith defense.
Spires v. Ben Hill County, 980 F. 2d 683 (11th Cir. 1993)

        (e) Crawford cannot rely upon DOL Wage and Hour Op. Ltr. (March 3, 2003),
because it is inconsistent with the plain language of the regulation, 29 U.S.C. § 516.4,
which unambiguously requires that every employer post the FLSA notice, and opinion
letters of the Department of Labor, unlike regulations, are not entitled to deference.
Christensen v. Harris County, 529 U.S. 576, 586-588 (U.S. 2000).

**3.      Defendant Failed To Meet Its Burden Of Showing That Plaintiff's Had Actual Knowledge Of Their Legal Right To Overtime More Than Two Years Before The Filing Of The Complaint.**

42.      Where no notice was posted, the defendant bears the burden of proving that the Plaintiff was aware of his rights. Nogar v. Henry F. Teichmann, Inc., 640 F. Supp. 365, 370 (D. Pa., 1985) (citing McClinton v. Alabama By-Products Corp., 743 F.2d 1483 (11th Cir. 1984)).

43.      A plaintiff's contact with an attorney does not commence the running of the statute of limitations until the plaintiff is actually informed of his individual rights under the statute. Nogar v. Henry F. Teichmann, Inc., 640 F. Supp. 365, 370-71 (W.D. Pa. 1985).

44.      General knowledge of overtime laws or "suspicions" that the employer violated overtime laws does not commence the running of the statute of limitations until the plaintiff has proper cognizance, that is, until the plaintiff consults an attorney regarding this matter and was specifically advised of his individual legal rights in this area or received information of a character tantamount to the type of knowledge in which an attorney would impart to his client regarding that individual's specific right to overtime.   Callowhill v. Allen-Sherman-Hoff Company, Inc., 832 F.2d 269, 270-71 (3rd Cir. 1987); Sonnier v. Crawford & Company, CA: 94-1755 (W.D.Pa. 1997); Opinion and Order of Court dated May 2, 2005, at 13.

45.      Despite the findings of the Department of Labor, set forth at Finding of Fact 6 Crawford continues to maintain that employees like Plaintiffs, adjusters and monitors, are exempt from the overtime requirements, and it should not be entitled to charge Plaintiffs of the knowledge of their legal rights as a matter of law.

31

Dated: July 18, 2005                    Respectfully Submitted,

                                        _____
                                        Joseph E. Fieschko, Jr., Esquire
OF COUNSEL:                             P.A. ID # 28797
                                        FIESCHKO & ASSOCIATES, INC.
Tybe A. Brett, Esquire                  2230 Koppers Building
P.A. ID # 30064                         Pittsburgh, PA  15219
4710 US Steel Plaza                     (412) 281-2204
Pittsburgh, PA 15219
(412) 288-4387

                                        John R. Linkosky, Esquire
                                        P.A. ID # 66011
                                        JOHN LINKOSKY & ASSOCIATES
                                        715 Washington Ave.
                                        Carnegie, PA 15106
                                        (412) 278-1280

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WELLS HANN, ELDA COCO,                          CIVIL DIVISION
PERSONAL REPRESENTATIVE
OF THE ESTATE OF JAMES COCO,                    NO.: 00-1908
deceased, EDWARD HANN, BILLY
MYERS, FLOYD KING and DOUG                      Chief Judge Donetta Ambrose
RADIGAN,                                        Chief Magistrate Judge Francis X.
                                                Caiazza
                Plaintiffs

        vs.

CRAWFORD & COMPANY, a corporation,

                Defendants

### CERTIFICATE OF SERVICE

I, Regina Fieschko, secretary for Joseph E. Fieschko, Jr., do hereby certify that I

have served a true and correct copy of the Plaintiffs' Proposed Finding of Fact and

Conclusion of Law first class mail, postage prepaid, on the following:

Robert H. Buckler, Esquire
Troutman Sanders
Bank of America Plaza
600 Peachtree Street, N.E.
Suite 5200
Atlanta, GA  30308-2216

Dated: July 18, 2005

                                        Regina Fieschko
                                        Fieschko and Associates
                                        2230 Koppers Building
                                        Pittsburgh, PA  15219